# Illinois Official Reports

## Appellate Court

*Central Mutual Insurance Co. v. Tracy's Treasures, Inc.*, 2014 IL App (1st) 123339

| | |
|---|---|
| Appellate Court Caption | CENTRAL MUTUAL INSURANCE COMPANY, Plaintiff-Appellee and Cross-Appellant, v. TRACY'S TREASURES, INC., and PAUL IDLAS, Defendants-Appellants and Cross-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-12-3339 |
| Filed | September 30, 2014 |
| Rehearing denied | October 28, 2014 |
| Modified upon denial of rehearing | November 5, 2014 |

| | |
|---|---|
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a declaratory judgment action seeking a determination of whether plaintiff insurer was obligated to provide coverage for its insured in an underlying class action seeking damages for violations of the Telephone Consumer Protection Act arising from the insured's transmission of unsolicited faxes and the insured had obtained its own counsel and entered into a settlement of the underlying action providing for a $14 million judgment that would be enforceable only against plaintiff's policies, the entry of summary judgment finding that plaintiff was not obligated to provide coverage based on the Illinois Appellate Court's decision in *Lay*, which holds that awards under the Act are punitive and uninsurable, was reversed, since the Illinois Supreme Court later reversed that decision and held that such awards are insurable liquidated damages; furthermore, the denials of plaintiff's motions for summary judgment seeking determinations that the settlement between its insured and the underlying plaintiff was collusive and unreasonable and that the policies issued to its insured had been reformed to eliminate coverage for "advertising injury" and "personal advertising injury" were reversed and the cause was remanded for further proceedings, in view of the existence of material issues of fact with regard to the reasonableness of the underlying settlement. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CH-14995; the Hon. Rita M. Novak, Judge, presiding. |
|---|---|
| Judgment | Reversed in part and affirmed in part; cause remanded. |
| Counsel on Appeal | Anderson & Wanca, of Rolling Meadows (Brian J. Wanca, David M. Oppenheim, and Jeffrey A. Berman, of counsel), and Bock & Hatch, LLC, of Chicago (Phillip A. Bock and Robert M. Hatch, of counsel), for appellants. |
| | Purcell & Wardrope, of Chicago (Michael D. Sanders, of counsel), and Rivkin, Radler, LLP, of Uniondale, New York (William M. Savino, Stephen J. Smirti, Jr., and M. Paul Gorfinkel, of counsel), for appellee. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Neville concurred in the judgment and opinion. |

**OPINION**

¶ 1 This insurance declaratory action raises issues regarding: (1) whether coverage is available for an underlying class action alleging claims for unsolicited faxes in violation of the federal Telephone Consumer Protection Act (TCPA) (47 U.S.C. § 227(b)(1) (2006)); (2) the reasonableness of a settlement in the underlying action between the insured and the underlying plaintiffs, which those parties stipulated would be paid from the proceeds of the insurance policies; and (3) whether the "buyout" of coverage under the insurance policies, which resulted from a settlement of a prior class action against the insured, precludes claims under the "advertising injury" coverage of these policies. Due to an intervening change in the law that formed the basis of the trial court's ruling in favor of plaintiff and cross-appellant, Central Mutual Insurance Company, we must reverse. We affirm the other rulings appealed by Central and remand for further proceedings.

¶ 2 BACKGROUND

¶ 3 Tracy's Treasures, Inc. (Tracy's), is the insured under a number of primary and excess commercial liability policies issued by Central. Central insured Tracy's under a series of business owner primary liability insurance policies, cumulatively effective from May 5, 1997,

until May 5, 2005, and a series of commercial excess liability insurance policies, cumulatively effective from January 29, 2002, until January 29, 2005. The face value of all of Central's policies of insurance in effect during the relevant time period is $14 million.

¶ 4 Tracy's and Paul Idlas, the plaintiff in the underlying class action, appeal from an order of the trial court granting Central's motion for summary judgment. The trial court determined, in accordance with the decision in *Standard Mutual Insurance Co. v. Lay*, 2012 IL App (4th) 110527, that amounts awarded to claimants under the TCPA are punitive in nature and therefore not insurable. After the filing of this appeal, our supreme court reversed *Lay* and held that damages awarded for TCPA claims are liquidated rather than punitive and, thus, are not uninsurable as a matter of public policy. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617.

¶ 5 Central concedes the applicability of the supreme court's decision in *Lay* but argues that liquidated damages, such as those provided for under the TCPA, are not covered under its policies. Central also advances other provisions of its policies as a bar to coverage for TCPA claims. Finally, Central cross-appeals from two rulings denying its motions for summary judgment: (1) in one motion for summary judgment, Central sought a determination that the settlement reached between its insured and Idlas was, as a matter of law, collusive and unreasonable under the standards articulated by our supreme court in *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141 (2003); (2) Central also sought summary judgment on the ground that the insurance contracts had been reformed to eliminate coverage for "advertising injury" or "personal and advertising injury." Both motions were denied by the trial court.

¶ 6                                    The *Idlas* Case

¶ 7 Tracy's engaged in the business of selling dating and social relationship services, which it publicized, at least in part, by facsimile advertisements. On March 5, 2007, Idlas filed a three-count class action complaint against Tracy's for unsolicited fax advertisements that allegedly violated the TCPA, the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2006)), and Illinois common law (hereinafter, *Idlas*). Idlas alleged that between March 5, 2003 and March 5, 2007, Tracy's sent unsolicited facsimile messages advertising Tracy's dating services without prior express permission from the recipients. Idlas received his unsolicited fax on July 22, 2003, and waited almost four years to seek redress.

¶ 8 Tracy's tendered Idlas's claims to Central pursuant to the insurance contracts. On April 27, 2007, Central disclaimed coverage for the claims asserted in *Idlas* on several grounds, including that (i) in 2005 the parties had agreed to a "buyout" of the coverage for personal and advertising injury, (ii) no "occurrence" giving rise to "property damage" was alleged in *Idlas*, (iii) any injury caused by the faxes sent by Tracy's was expected or intended by Tracy's, and (iv) Tracy's knew that its conduct in sending the faxes was prohibited.

¶ 9 Despite Central's denial of coverage, it advised Tracy's on October 8, 2007, that it was assigning a lawyer to provide Tracy's a "courtesy defense." Counsel appointed by Central filed an appearance in the case. Billing records for assigned counsel reflect that he filed a motion to dismiss and discovery requests. The record on appeal does not contain the motion, but counsel's records reflect that portions of the *Idlas* complaint were dismissed with leave to replead. On June 6, 2007, Central also filed a declaratory judgment action in the circuit court of

Cook County seeking an adjudication that it owed no duty to defend or indemnify Tracy's in connection with *Idlas*.

¶ 10    On November 29, 2007, another lawyer, Gregory Ellis, filed a substitute appearance on behalf of Tracy's. Two weeks later, on December 12, 2007, Ellis wrote to Central regarding the substitution. Ellis advised that Tracy's retained him due to the conflict between Central and Tracy's in light of Central's position that the *Idlas* claims were not covered under its policies. In his letter, Ellis described to Central his planned defense of the case:

> "My goal would be to attack the viability [of] any finding of a class action in this case. From my review it looks like names of at least 10,000 customers are known. This may be the level of damage control. The fact that the lists are 4½ to 6 years old could be in Tracy's Treasures favor because of the transient nature of our society these people may not be able to be contacted. Additionally, a great number of people may well opt-out from this type of case.
>
> In any event, as I am transitioning into this lawsuit I will be contacting you further about the status of the case as I further get my arms around the facts and circumstances and the current law on the TCPA in Illinois and elsewhere. However, you can see from the attached letter that I am familiar with these types of cases and the current law."

¶ 11    On December 17, 2007, Central consented to the substitution of counsel and indicated that it would pay Ellis a reasonable fee (albeit at an hourly rate less than Ellis's normal billing rate). Central reserved the right to discontinue paying for Tracy's defense on reasonable notice to Tracy's. The record does not reflect that Tracy's ever complained about the rate Central was paying Ellis or informed Central that its decision to pay less than Ellis's normal billing rate constituted a breach of its obligations to Tracy's under the policies. The record also does not reflect whether Tracy's paid Ellis the difference between his hourly rate and the rate at which he was being paid by Central.

¶ 12    Correspondence in the record indicates that a month before he wrote to Central and even before he filed an appearance for Tracy's, Ellis was discussing settlement with counsel for Idlas. On November 15, 2007, two weeks before he filed his substitute appearance and nearly a month before he claimed to be "transitioning into" the lawsuit, Ellis wrote to Tracy Choubmesser, president and sole shareholder of Tracy's, informing her:

> "Idlas will settle with Tracy's and you personally but you need to give them all the names/fax numbers or faxing and listing company so they can notify 90,000 people. I'm preparing a settlement agreement and I have talked to [Idlas's] attorney to get this done in the next 30 days."

¶ 13    In a November 27, 2007 letter to Idlas's attorney, Ellis wrote, "I met with Tracy today. She seems to have gotten onboard. *** Let me know what you think about this information." And in a December 10, 2007 letter to Choubmesser, Ellis wrote:

> "In order to prepare the Settlement Agreement that we have discussed, we will need additional information regarding these fax providers to use in your Affidavit in support of this settlement."

¶ 14    Ellis failed to disclose the ongoing settlement negotiations in his December 12, 2007 letter to Central.

¶ 15    On January 25, 2008, six weeks after he wrote to Central, Ellis, on behalf of Tracy's, and counsel for Idlas filed with the Lake County circuit court a motion for preliminary approval of

- 4 -

a settlement agreement providing for entry of a $14 million judgment against Tracy's, which was enforceable only against Central's policies. No notice of the motion was provided to Central. On February 5, 2008, the court preliminarily approved the settlement.

¶ 16   In their motion, as well as in other materials submitted in support, counsel for Tracy's and Idlas represented:

> "2. Through arms-length negotiation, the parties reached an agreement to settle the claims of [Idlas] and the Class, as set forth in the [attached] Agreement ***.
>
> 3. Counsel for [Idlas] and Tracy's Treasures have reviewed and analyzed the legal and factual issues presented in this action, the risks and expenses involved in pursuing the litigation to conclusion, the likelihood of a damage award in excess of that negotiated in this settlement, the protracted nature of the litigation, and the likelihood, costs and possible outcomes of one or more procedural and substantive appeals. Based upon their review and analysis, [Idlas] and [Tracy's] agreed to and executed the Agreement."

¶ 17   The settlement agreement provided for class counsel to be paid attorney fees equal to one-third of the recovery from Central plus costs. Each class member who submitted a claim form was to receive a *pro rata* share of the amount recovered from the insurance policies, "not to exceed $500.00 regardless of the number of facsimiles received." The agreement provided for an incentive award of $9,500 to Idlas "for his services on behalf of the Class as the class representative." (The record does not disclose what "services" Idlas rendered as class representative justifying a recovery of 19 times greater than the potential recovery of every other class member and, in particular, it does not appear that Idlas was ever deposed.) Finally, pursuant to the settlement, any unclaimed funds would be "given to charitable organizations approved by the Court."

¶ 18   The motion also stated that "[Central] has denied coverage, claims it has no obligation to defend or indemnify and has filed a declaratory judgment action seeking [a] coverage determination in the Circuit Court of Cook County." Additionally, the motion declared: "Central Mutual is not controlling the defense of [the *Idlas*] case. Tracy's has retained its own counsel."

¶ 19   Although the *Idlas* complaint alleged a putative class of recipients who had received faxes four years prior to the filing of the complaint (from March 5, 2003 through March 5, 2007), the settlement agreement defined the class as those persons who allegedly received unsolicited faxes during the period from September 1, 2002, through July 22, 2003, the date Tracy's last sent a fax advertisement. It does not appear that any class members came forward to allege receipt of an unsolicited fax prior to July 22, 2003, yet the class was expanded to include a period of time prior to Idlas's receipt of his fax and outside what plaintiffs claimed was the four-year statute of limitations applicable to the TCPA claim. Without expansion of the class definition to a time period earlier than the one originally alleged in the *Idlas* complaint, a $5 million excess policy issued by Central that expired on January 29, 2003, would not have been triggered.

¶ 20   Attached to the motion for preliminary approval was Choubmesser's affidavit. Choubmesser testified that "Central Mutual declined to defend or indemnify Tracy's in this case" and attached the April 27, 2007 letter from Central to Tracy's denying coverage. Choubmesser also stated that "Tracy's has hired its own attorneys to represent it in this matter. Central Mutual is not controlling Tracy's defense in this matter." The affidavit did not disclose

that Central had hired and paid for counsel to provide Tracy's a "courtesy defense," that Central was paying for substitute counsel selected by Tracy's, or that the reason Central was not controlling Tracy's defense was because of a conflict of interest and not because Central refused to respond to Tracy's demand.

¶ 21   In Choubmesser's affidavit, she stated that Tracy's engaged various fax broadcasting services to obtain contact lists and transmit Tracy's advertisements by fax. The fax broadcasters represented their lists consisted of people who had consented to receive advertisements by fax and that their practice of broadcasting the faxes was legally compliant. According to Choubmesser, nearly 140,000 faxes were sent on behalf of Tracy's during the class period (now expanded to include more than 34,000 additional class members who received faxes between September 1, 2002, and March 5, 2003).

¶ 22   Of the total universe of putative class members, Tracy's, as noted by Ellis, was only able to produce a list of approximately 10,000 fax numbers. Pursuant to the settlement, those class members were to receive notice of the settlement via fax; the remainder (and vast majority) of class members were to receive notice by publication. The faxed and published notices set a deadline of April 25, 2008 for the submission of claims.

¶ 23   In connection with the hearing on final approval of the settlement, the fax broadcast contractor that sent the notice to the class submitted an affidavit. Out of a total of 9,838 fax notices that were sent to identifiable recipients of the faxes transmitted in 2002 and 2003, 5,561 transmissions were successful and 4,277 failed. Thus, only 5,561 putative class members identified by fax number–representing roughly 4% of the total class–actually received the class settlement notice.

¶ 24   There is no evidence in the record regarding how many claims were submitted by the April 25, 2008 deadline. During oral argument, counsel for Tracy's represented that although notice of the settlement has been effected and the claims deadline has passed, the claims process is "on hold" and thus no claims from class members have been processed. One class member opted out of the settlement. On May 13, 2008, the court entered a final approval order and reduced the $14 million settlement to a judgment.

¶ 25                                    The *White* Case

¶ 26   Several years before the *Idlas* action was commenced, Tracy's was a defendant in another suit arising under the TCPA, captioned Law Offices of Martha J. White, P.C. v. Tracy's Treasures, Inc., No. 03 CH 11297 (Cir. Ct. Cook Co.) (*White*). In that case, filed July 8, 2003, the plaintiffs also alleged that Tracy's had violated the TCPA by sending them unsolicited facsimile advertisements of the same type involved in *Idlas*. Four of the named plaintiffs alleged that they received faxes in October, November and December 2002; the remaining plaintiff received his fax in May 2003. Central defended Tracy's and subsequently settled the *White* case on behalf of Tracy's with certain of the *White* plaintiffs for $12,000. The motion for class certification was withdrawn and the case was dismissed without prejudice on September 6, 2005, without notice to putative class members.

¶ 27   In connection with Central's settlement of *White* on behalf of Tracy's, Tracy's agreed, in a confidential settlement agreement, that all of the insurance policies issued by Central were reformed to eliminate coverage for "advertising injury" and "personal and advertising injury." Although the record reflects that a copy of the *White* settlement agreement was provided to the

circuit court under seal, a copy is not included in the record on appeal.

¶ 28                            Proceedings in the Trial Court

¶ 29    Central moved for summary judgment arguing that the $14 million settlement reached between Idlas and Tracy's was collusive and unreasonable as a matter of law under the standards articulated by our supreme court in *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141 (2003). The trial court denied this motion, finding that these claims raised several disputed issues of fact. Central argues this ruling was erroneous.

¶ 30    Central also sought summary judgment on the basis that the insurance contracts no longer contained any provision for coverage for either "advertising injury" or "personal and advertising injury." The trial court, citing *Reagor v. Travelers Insurance Co.*, 92 Ill. App. 3d 99 (1980), denied Central's motion, finding that since Idlas's rights vested on July 22, 2003, when Idlas received his fax, "Tracy's and Central [could not] agree to divest Idlas in a secret agreement concluded in November of 2005." Central likewise challenges this ruling.

¶ 31    After Tracy's and Idlas appealed the order granting Central summary judgment based on *Lay*, Central timely cross-appealed the denial of its motions for summary judgment.

¶ 32                                        ANALYSIS

¶ 33    At the outset, we note that Central's statement of facts in its opening brief contravenes Illinois Supreme Court Rule 341(h)(6) (eff. July 1, 2008). Central's rendition of the facts is argumentative, recites facts without proper citation to the record, and incorporates facts that are not necessary to the disposition of this appeal. We have reviewed the record and Tracy's statement of facts, and any inappropriate or unsupported statements will be disregarded (*Board of Managers of Eleventh Street Loftominium Ass'n v. Wabash Loftominium, LLC*, 376 Ill. App. 3d 185, 187 (2007)), but we caution counsel that disregard of the rules applicable to appellate briefs hinders the efficient disposition of an appeal. We now turn to the merits of this appeal.

¶ 34    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). We review the trial court's summary judgment ruling under a *de novo* standard of review. *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141, 149 (2003); *American Service Insurance Co. v. Jones*, 401 Ill. App. 3d 514, 520 (2010). This court has the authority to grant summary judgment based on the record before us. See Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994) (this court has the power to make any further order or grant any relief that the "case may require").

¶ 35    Because our supreme court's decision in *Lay* determined that claims under the TCPA are not uninsurable as a matter of law based on its finding sums awarded on such claims do not constitute punitive damages, the basis for the trial court's ruling granting summary judgment in favor of Central is no longer viable, and we must reverse. Central nevertheless argues that summary judgment in its favor can be affirmed on the basis of arguments advanced in support of its earlier motions for summary judgment, which it claims the circuit court erroneously rejected, as well as its contention that its policies do not cover liquidated damages. Since we may affirm the grant of summary judgment on any basis appearing in the record (*Salerno v. Innovative Surveillance Technology, Inc.*, 402 Ill. App. 3d 490, 496 (2010)), we will consider

Central's alternative arguments.

¶ 36                    Do Central's Policies Cover Liquidated Damages?

¶ 37    Conceding the holding of our supreme court in *Lay* that the amounts recoverable under the TCPA do not constitute punitive damages, Central nevertheless contends that its policies do not cover liquidated damages. Central reasons that because damages awarded under the TCPA do not represent actual losses, but are rather an incentive for private parties to enforce the statute, and because insurance covers only compensatory damages–that is, damages that one must expend to remedy an injury–awards under the TCPA are liquidated, not compensatory, damages that are not covered by Central's policies.

¶ 38    We can address this argument summarily. In *Outboard Marine Corp.*, our supreme court recognized that the concept of "damages" includes all "money required to be expended in order to right a wrong." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 115-16 (1992). In the TCPA, Congress has determined that the sum of $500 is the amount that will compensate a recipient of an unsolicited fax for the invasion of privacy, inconvenience and loss of use of the recipient's fax machine, ink, toner and paper. 47 U.S.C. § 227(b)(3) (2006). The fact that the sum is set by statute does not mean that it falls outside the definition of "damages."

¶ 39    In *Outboard Marine*, the court observed that "[i]f the insurer had desired to restrict coverage to only those suits seeking legal, compensatory damages, it could have easily included among its exclusionary provisions an exclusion pertaining to the costs of complying with mandatory injunctions." *Outboard Marine*, 154 Ill. 2d at 117. We have no reason to believe that our supreme court would apply the reasoning of *Outboard Marine* any differently in this context. If Central wanted to exclude damages set by statute from the scope of its obligation to pay "those sums" that Tracy's would be required to pay "as damages," as a result of property damage or advertising injury, it could easily have done so. Central points to no provision of its policies that excludes such sums from the definition of "damages." Therefore, we reject Central's claim that its policies do not cover liquidated damages awarded pursuant to the TCPA.

¶ 40                    Can Central Challenge the *Idlas* Settlement and, if So,
            Is Tracy's Decision to Settle and the Amount of That Settlement Reasonable?

¶ 41    The first issue we address focuses on Central's claim that the *Idlas* settlement was unreasonable and the product of collusion. Tracy's and Idlas counter that this court should not examine the terms of the settlement or the circumstances surrounding its negotiation because Central is precluded from questioning its reasonableness.

¶ 42    Tracy's and Idlas argue that Central cannot challenge the settlement terms because: (i) Tracy's had a right to settle without Central's consent once Central ceded defense of the case to independent counsel; (ii) any effort to obtain Central's consent would have been futile; and (iii) there is no prejudice to Central. Further, Tracy's and Idlas claim that the trial court in *Idlas* determined that the settlement was reasonable and therefore Central cannot challenge that finding here, as Central may not relitigate the issue. Finally, Tracy's and Idlas contend that, in any event, the settlement was reasonable.

¶ 43                    *Can Central Challenge Its Obligation to Pay the Idlas Settlement?*

¶ 44        Tracy's and Idlas are correct that in Illinois, when an insurer cedes control of the defense of an action against its insured, the insured may enter into a reasonable settlement agreement without the insurer's consent. *Myoda Computer Center, Inc. v. American Family Mutual Insurance Co.*, 389 Ill. App. 3d 419, 425 (2009). An insurer may cede control of the defense under two scenarios: (1) when a conflict of interest exists, which entitles the insured to control the defense through counsel of its own choosing; or (2) when the insurer breaches its duty to defend, thereby requiring the insured to assume its own defense.

¶ 45        Under Illinois law, a conflict of interest arises when "the interests of the insurer would be furthered by providing a less than vigorous defense to the allegations against the insured." *Mobil Oil Corp. v. Maryland Casualty Co*., 288 Ill. App. 3d 743, 756 (1997). Such a situation arises, for example, when a complaint alleges both negligent and intentional conduct by the insured. In that instance, beyond the mutual interest of insurer and insured in securing a determination of nonliability, the financial interest of the insurer would be served by a finding that the insured's conduct was intentional since that finding would likely render policy exclusions applicable, while the insured's interest would favor a finding of negligence, thus implicating coverage under the policy. Under these circumstances the insured has the right to reject the defense being offered by the insurer, select an attorney of its own choice, control the defense of the case, and recover its defense costs from the insurer. *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 198-99 (1976).

¶ 46        In light of the declaratory judgment action and Central's position that the claims asserted in *Idlas* were not covered under its policies, a conflict of interest arose between Central and Tracy's and Tracy's was entitled to substitute an attorney of its choice for the attorney assigned by Central. Central acquiesced to Tracy's independent counsel and agreed to compensate Tracy's chosen counsel at a rate set by Central. Because Central surrendered control of the defense, it also surrendered its right to control the settlement of the action and to rely on policy provisions requiring consent to settle. *Myoda*, 389 Ill. App. 3d at 425. For the same reason, Tracy's conduct in settling the underlying suit does not contravene the policy provision prohibiting an insured from voluntarily assuming an obligation ("No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense *** without our consent."). Thus, the fact that Tracy's voluntarily entered into the settlement without Central's permission is not a bar to Central's obligation to pay the settlement.

¶ 47        But Tracy's ability to settle the underlying suit without Central's permission does not, standing alone, render the settlement automatically binding on Central. Tracy's and Idlas rely on *Myoda* and *Pekin Insurance Co. v. XData Solutions, Inc.*, 2011 IL App (1st) 102769, in support of the argument that Central cannot challenge the settlement here because it ceded control of Tracy's defense.

¶ 48        In *Myoda*, American Family undertook the defense of Myoda under a reservation of rights. A potential conflict of interest arose and American Family surrendered control of the defense to Myoda's independent counsel. *Myoda*, 389 Ill. App. 3d at 425. The court concluded that since American Family no longer controlled Myoda's defense, Myoda's failure to seek American Family's consent to the settlement did not bar an action for indemnification. *Id.* The court followed and quoted from *Commonwealth Edison Co. v. National Union Fire Insurance Co.*, 323 Ill. App. 3d 970 (2001). In that case, the court held that Commonwealth Edison was

not required to obtain National Union's consent prior to settling because National Union was not controlling the defense due to a conflict of interest. *Commonwealth Edison*, 323 Ill. App. 3d 970. Commonwealth Edison therefore did not breach the voluntary payments provision under the policy. *Id.* at 985. Conversely, because National Union defended under a reservation of rights and ceded control of the defense due to a conflict of interest, National Union also did not breach its duty to defend and thus, "the settlement in the underlying case did not compromise National's ability to contest indemnification in the [declaratory judgment] action." *Id.*

¶ 49    In *XData*, Pekin argued it had no duty to indemnify its insured for a class settlement between its insured and underlying plaintiffs because the insured violated the insurance policy's "voluntary payments" provision. *XData*, 2011 IL App (1st) 102769, ¶ 28. Finding that Pekin abandoned its insured by denying coverage and refusing to defend, the court concluded that Pekin breached its duty to defend and the insured did not need Pekin's consent before entering into the settlement agreement. *Id. ¶* 31. The court also noted that it found no evidence of collusion in connection with the settlement. *Id.* ¶ 32.

¶ 50    *Guillen* holds that even where an insurer has breached its duty to defend, it may nevertheless be heard on the issue of the reasonableness of the decision to settle and the amount of the settlement before being required to pay it. *Guillen*, 203 Ill. 2d 141. What an insurer who breaches its duty to defend forfeits is the ability to raise the provisions of the policy as a bar to enforcement of the settlement against policy proceeds. *Id.* at 159-62. The rationale for this result is that the insurer, having breached the contract, should not be able to enforce the provisions of that same contract in order to defeat coverage**.** *Id*. at 161-62. But where an insurer has not breached its duty to defend, it necessarily has not only the same rights to be heard on the reasonableness of the settlement afforded under *Guillen*, but it is also entitled to contest whether the claims asserted in the underlying action fall within the policy's coverage.

¶ 51    As is evident from these authorities, the fact that an insured is not required to obtain the insurer's consent to a settlement does not necessarily preclude the insurer from later contesting the reasonableness of the settlement. Further, where the insurer has preserved its rights by filing a declaratory judgment action, even though it is not participating in its insured's defense and even though the underlying case may be settled without its consent, the insurer may still challenge its obligation to pay the settlement. *Myoda*, 389 Ill. App. 3d at 425.

¶ 52    Here, Central preserved its right to contest coverage by filing a declaratory judgment action. Central did not "abandon" its insured–it denied coverage and provided a "courtesy defense" to Tracy's. Upon Tracy's tender of the *Idlas* defense to Central, Central disclosed to Tracy's its position that the claims asserted were not covered under its policies and did nothing thereafter to prejudice Tracy's defense of the case. See *Gibraltar Insurance Co. v. Varkalis*, 46 Ill. 2d 481, 487 (1970) (insurer that controlled defense of wrongful death action for 16 months without disclosing issues regarding coverage under its policy estopped from denying liability under the policy); *Mobil Oil*, 288 Ill. App. 3d at 755 (insurer that controlled insured's defense for 2½ years without disclosing potential limitation on coverage was estopped from claiming that it was not obligated to fully indemnify insured). When Tracy's retained substitute counsel, Central continued to pay for Tracy's independent legal counsel. Given that Central neither breached its duty to defend nor controlled the defense of *Idlas* to Tracy's detriment, Central retained the ability to contest both the reasonableness of the settlement and whether the claims

giving rise to the settlement are covered under its policies. Thus, we will next consider Central's contention that the *Idlas* settlement is not binding because, as a matter of law, it is unreasonable.

¶ 53　　　　　*What Standards Apply to Evaluating the Reasonableness of the Idlas Settlement?*

¶ 54　　　*Guillen* articulates the standards we must use to evaluate whether the settlement reached in *Idlas* is binding on Central. In *Guillen*, the plaintiff in the underlying personal injury action claimed that she was exposed to lead-contaminated paint in an apartment rented to her by defendants. *Guillen*, 203 Ill. 2d at 143. After defendants tendered defense of the claim to Potomac, the insurer denied its obligation to defend or indemnify based on a recently added endorsement to defendants' policy excluding such claims. *Id.* at 143-44. Potomac neither defended under a reservation of rights nor filed an action seeking to declare its rights under the policy. *Id.* at 144. Defendants ultimately settled the plaintiff's claim for $600,000 and assigned the plaintiff their rights under the Potomac policy. *Id.*

¶ 55　　　After rejecting Potomac's invocation of the exclusion and its argument that its insured's assignment of rights under the policy to the underlying plaintiff was ineffective, the supreme court turned to a discussion of Potomac's ability to challenge its responsibility to pay the settlement. Adopting the majority view, the court concluded that although Potomac's concern over the possibility of collusion was well taken, "the risk of collusion and fraud can be lessened ***, if not avoided altogether, by placing a requirement upon the plaintiff to prove that the settlement it reached with the insured was reasonable before that settlement can have any binding effect upon the insurer. [Citations.]" *Id.* at 163.

¶ 56　　　The court then delineated two "reasonableness" inquiries that must be addressed. First, with respect to the insured's decision to settle, "the litmus test must be whether, considering the totality of the circumstances, the insured's decision 'conformed to the standard of a prudent *uninsured*.' (Emphasis added.) *Rhodes v. Chicago Insurance Co.*, 719 F.2d 116, 120 (5th Cir. 1983)." *Id.* Second, in reference to the amount of the settlement, "the test 'is what a reasonably prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim.' *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982)." *Id.* The latter test involves a "commonsense consideration of the totality of 'facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial.' *Miller*, 316 N.W.2d at 735." *Id.* Under either test, the burden of proving reasonableness rests with the underlying plaintiff "both out of fairness, since the plaintiff was the one who agreed to the settlement, and out of practicality, since, as between the plaintiff and the insurer, the plaintiff will have better access to the facts bearing upon the reasonableness of the settlement." *Id.* at 163-64. The insurer is also entitled to rebut any preliminary showing of reasonableness with affirmative evidence bearing on the issue. *Id.* at 164.

¶ 57　　　Tracy's and Idlas argue that the Lake County court, in approving the settlement, has already found that the settlement was reasonable and therefore Central cannot "relitigate" that finding here. Apart from the fact that Central has not had the opportunity to be heard on the reasonableness of the *Idlas* settlement and thus cannot be criticized for relitigating anything, in *Stonecrafters, Inc. v. Wholesale Life Insurance Brokerage, Inc.*, 393 Ill. App. 3d 951 (2009), this court rejected an identical argument. Specifically, the *Stonecrafters* court held that a trial court's express finding of the reasonableness of the underlying settlement between the insured and the plaintiff can be challenged by the insurer where a settlement hearing is held without

notice to or participation by the insurer. *Id.* at 963-66. *Stonecrafters* concluded that the insurer is therefore not bound to the settlement until a hearing is held where the plaintiff presents facts bearing on the reasonableness of the settlement, which the insurer may contest. *Id* at 963.

¶ 58　　The same circumstances are present here. Tracy's and Idlas requested the Lake County court to schedule a fairness hearing to provide the class members an opportunity to voice their position regarding the settlement. The Lake County court entered preliminary and final approval orders (both drafted by counsel for Tracy's and Idlas) finding, among other things, that: (1) the settlement judgment was made in reasonable anticipation of liability; (2) the amount was fair and reasonable (3); Tracy's decision to settle conformed to the standard of a prudent uninsured; and (4) the agreed damages amount was what a reasonably prudent person in Tracy's position would have settled for on the merits of the claims in this litigation. Obviously, these last two findings had no bearing on whether the settlement was fair and reasonable vis-à-vis class members, but were apparently included by Tracy's and Idlas in an effort to short circuit Central's ability to later challenge the settlement. As these orders were entered by agreement, the record does not reflect that the court made any substantive determinations regarding the parties' representations and, specifically, whether Tracy's acted as a prudent uninsured in agreeing to settle or as a reasonably prudent person in negotiating a $14 million settlement. Thus, the findings made in connection with preliminary and final approval of the *Idlas* settlement are not binding on Central unless and until a hearing is conducted at which Idlas sustains his burden to demonstrate the reasonableness of both the decision to settle and the amount of the settlement and Central is afforded the opportunity to rebut that showing.

¶ 59　　　　　　　*Is the Idlas Settlement Unreasonable and Collusive as a Matter of Law?*

¶ 60　　Central contends, however, that no hearing is necessary here and the trial court should have determined, based on the evidence in the record, that the *Idlas* settlement was unreasonable and collusive as a matter of law. While we acknowledge that there are certainly strong indications that the settlement was collusive–facts and circumstances that the trial judge properly characterized as "very troubling"–we agree with the trial court that these issues are not subject to resolution on summary judgment. As a hearing is required on remand, and because the parties' briefs display such divergent views on the matters that may be considered by the trial court, we discuss the issues the court will be called on to address at the hearing on the reasonableness of the settlement.

¶ 61　　Although Central makes much of the fact that it was not given notice of the hearings on preliminary and final approval of the settlement, we conclude that this fact, while undisputed, does not tip the balance one way or the other. Central articulates no basis for imposing such an obligation on the parties in the underlying case or, in particular, on substitute counsel for Tracy's. Given the acknowledged conflict between Central and Tracy's, once Ellis appeared for Tracy's and Central consented to the substitution, Central had no role in Tracy's defense or the decision whether to settle and, if so, for what amount. Further, once counsel appointed by Central withdrew from the case, Central must have recognized that no counsel in the case was representing its interests. Although Central could easily have assigned counsel to monitor the case, it failed to do so. See *Peppers*, 64 Ill. 2d at 199 ("[The insurer] is entitled to have an attorney of its choosing participate in all phases of this litigation subject to the control of the case by [the insured's] attorney ***.") And while Central criticizes Ellis for "misrepresenting"

his plans for defense of the case and failing to keep Central apprised of the litigation's progress as he told Central he would, the truth is that as counsel for Tracy's, he had no obligation to do so.

¶ 62    Once he appeared for Tracy's, Ellis's sole obligation was to represent Tracy's interests. So although, as we discuss below, Ellis's misrepresentations and other conduct may certainly have a bearing on other issues arising at the reasonableness hearing, they do not bolster Central's position regarding the effect of its nonparticipation in the hearings regarding approval of the settlement. Thus, the lack of notice to Central is not determinative of the reasonableness of the *Idlas* settlement.

¶ 63    Turning to the reasonableness tests under *Guillen*, as a threshold issue, the parties disagree on the characteristics of the "prudent uninsured" who faces the first reasonableness inquiry: the decision whether to settle *Idlas*. Central contends that the hypothetical must include the fact that the defendant's attorney fees are being paid and, therefore, this uninsured would have an incentive to litigate all viable issues. But this is counterintuitive. If we are hypothesizing a defendant without insurance, then that party is necessarily paying its own attorneys. The question then becomes whether the hypothetical defendant would reasonably choose to devote a portion of its assets to litigate (or at least threaten to litigate) certain issues designed to eliminate or, at a minimum, circumscribe its liability for the claims asserted in *Idlas*.

¶ 64    Just as Central skews the hypothetical "prudent uninsured" in its favor, so do Tracy's and Idlas. Their uninsured defendant (like the real defendant, Tracy's) lacks any significant assets and must decide whether to spend what little money it has litigating or instead settle with Idlas. But in order for the prudent uninsured test to have any meaning, we must assume that the defendant is not on the brink of bankruptcy and instead must posit that the uninsured defendant has assets sufficient to satisfy a substantial judgment and that it must weigh whether those assets are best put to use litigating certain issues that could lower the value of the case or whether an early settlement, presumably at a discount, is more advantageous. This is the only context in which a trial court can meaningfully assess whether a hypothetical prudent uninsured would put its own money at risk.

¶ 65    On the issue of the reasonableness of Tracy's decision to settle, the trial court will have to determine whether a prudent uninsured would have foregone the opportunity to litigate various motions before agreeing to a substantial settlement. In particular, Central contends that a prudent uninsured would have pursued a motion to dismiss certain of the claims in *Idlas* as time-barred.

¶ 66    Regarding the statute of limitations for TCPA claims, Tracy's and Idlas point to a decision from this court recognizing a four-year statute of limitations for such claims. (*Wellington Homes, Inc. v. West Dundee China Palace Restaurant, Inc.*, 2013 IL App (2d) 120740, ¶ 43), and argue that a prudent uninsured would not have pursued a motion to dismiss on this ground. Obviously, because *Wellington Homes* was decided more than five years after the parties were discussing settlement in *Idlas*, the decision is not necessarily indicative of the state of the law on the issue in 2007. Further, although the trial court in *Wellington Homes* denied a motion to dismiss based on the timeliness of plaintiff's complaint filed nearly three years after receipt of an unsolicited fax, the court certified the question to this court under Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010) because its order "involved a question of law as to which there is substantial ground for difference of opinion." The decision itself discusses in detail a split of authority, which, as of 2007, found three states applying the four-year limitations period under

- 13 -

the federal catchall statute of limitations and two states applying shorter state limitations periods. 2013 IL App (2d) 120740, ¶ 33. Under Illinois law, actions for statutory penalties are required to be commenced within two years of the date the cause of action accrued. 735 ILCS 5/13-202 (West 2006). Prior to our supreme court's decision in *Lay*, at least one court found that the sums provided for under the TCPA constituted punitive damages. *Standard Mutual Insurance Co. v. Lay*, 2012 IL App (4th) 110527 ¶ 37. Further, to the extent the statute provides for the trebling of damages for willful violations, it clearly imposes a penalty. 47 U.S.C. § 227(b)(3) (2006). Thus, it is clear that the limitations period applicable to TCPA claims was unsettled in 2007 when *Idlas* was filed and, to date, the issue has never been addressed by our supreme court. Such circumstances suggest that pursuit of a motion to dismiss on this basis would not have been a futile exercise.

¶ 67    Thus, the issue is whether a prudent uninsured in 2007 would have conceded the applicability of the most generous statute of limitations on the TCPA claim or instead have pursued a motion to dismiss. Resolution of this aspect of the *Guillen* reasonableness test will depend on evidence relating to, for example, the estimated cost of pursuing the motion and the likelihood of success considering the trend of authority on the issue. These and any other factors the trial court deems relevant may be considered in evaluating the reasonableness of Tracy's decision to settle.

¶ 68    Tracy's and Idlas point to the fact that counsel appointed by Central to represent Tracy's never engaged in such motion practice during the time he represented Tracy's and contend that this undercuts any assertion that a prudent uninsured should have pursued a different strategy. But assigned counsel testified in a deposition that he would not have pursued a motion based on the timeliness of the claims asserted in *Idlas* until the plaintiff's motion for class certification was resolved. Such strategy does not appear unreasonable. Therefore, the conduct of counsel assigned by Central to defend Tracy's is not the barometer of this aspect of the *Guillen* reasonableness test.

¶ 69    Central also argues that a prudent uninsured would have commenced third-party actions seeking contribution or indemnification from the fax broadcasters that claimed they had the recipients' permission to receive fax advertisements and also would have opposed class certification. It appears that in *White*, Tracy's did file a third party complaint against fax broadcasters for indemnification, contribution, and breach of contract, so this strategy was not unknown to Tracy's. Again, the trial court correctly determined that these issues in the context of this case are not amenable to resolution on summary judgment and, on remand, the court may consider evidence regarding the viability of such claims and legal positions and the cost to pursue them in determining whether a prudent uninsured would have adopted that course of action instead of reaching a quick settlement.

¶ 70    Another issue the trial court will be called upon to address is whether a prudent uninsured would have agreed that it faced staggering liability in *Idlas*. On this point, it is relevant that Idlas waited nearly four years to file this TCPA class action and, as Ellis acknowledged, by that time Tracy's was only able to produce a list of approximately 10,000 recipients of faxes it sent in 2002 and 2003. While Tracy's and Idlas stress the number of faxes originally sent multiplied by $500 per class member (a total exposure they estimate upwards of $60 million), it is apparent that in 2007, when the parties were aware that, at most, less than 10% of those who received the faxes would receive actual notice of the settlement, and, of those, significantly fewer were likely to file a claim, the reasonably anticipated value of potential claims was

vastly lower. And we view it as unlikely in the extreme that in the context of a class action with one named representative having a claim valued, at most, at $1,500 (see 47 U.S.C. § 227(b)(3) (2006) (providing for maximum damages of $1,500 for willful violations)), a court would deem it appropriate to enter a judgment against Tracy's in excess of $60 million on the strength of that claim alone.

¶ 71    Indeed, it would appear that a reasonable defense strategy for a prudent uninsured could have involved a stipulation regarding Tracy's liability (despite Tracy's assertion that it had been assured that the fax broadcasters it hired had the recipients' permission to receive faxes), with a trial limited to the amount of damages. Tracy's and Idlas assume that the outcome of a trial would have been a judgment in the amount produced by multiplying the number of faxes transmitted by $500. But in the context of TCPA claims, that result is by no means certain.

¶ 72    In enacting the statute, Congress's purpose was both to compensate recipients of unsolicited faxes for the admittedly minor annoyance such a communication entails and to deter transmitters like Tracy's from engaging in such conduct. See generally *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617 (discussing the legislative history of the TCPA, showing Congress recognized the costs imposed on the recipient and aimed to curtail the practice by providing an incentive for a plaintiff to bring suit on his own behalf); see also *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 323 F.3d 649, 654-55 (8th Cir. 2003). The statute was not designed to put those who advertise their products or services via fax out of business. So while from a purely theoretical standpoint, the liability faced by Tracy's might have been astronomical, from a practical perspective it was not. A trial court presiding over a class action–a creature of equity–would certainly possess the discretion to fashion a damage award that (1) fairly compensated claiming class members and (2) included an amount designed to deter future violations, without destroying defendant's business. See *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) (court found the possibility of annihilating damages was not a sufficient basis to deny class certification in a case involving statutory damages under the Fair Credit Reporting Act, but that after certification, the judge "may evaluate the defendant's overall conduct and control its total exposure"). See also *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892, 900-01 (W.D. Tex. 2001) (finding it "inequitable and unreasonable" to award damages in the amount of $2.34 billion against a 15-employee company and instead interpreting the TCPA authorize "up to" $500 per violation and awarding 7 cents per violation); *Freedman v. Advanced Wireless Cellular Communications, Inc.*, No. SOM-L-611-02, 2005 WL 2122304, at *4 (N.J. Super. Ct. Law Div. June 24, 2005) (finding it "manifestly unjust" to subject TCPA violator to a $23,000,000 judgment "for damages to an entire class of plaintiffs when Congress intended damages of $500 to be pursued by individual plaintiffs"). In this context, the trial court will have to determine whether a prudent uninsured would have agreed that $14 million to settle a $60 million case was a good bargain or whether some effort to reach a significantly lower figure would have been made.

¶ 73    Finally, the trial court will have to determine whether a prudent uninsured, settling *Idlas* with its own funds, would have agreed to a settle on terms that allowed unclaimed funds to be distributed through *cy pres*. As we have discussed, at the time *Idlas* was settled, the parties were aware that only relatively few class members were likely to actually receive notice. Given this knowledge, and assuming, without deciding, that it was reasonable for the parties to predicate their settlement negotiations on the supposition that every class member with an identified fax number would both receive the faxed notice and file a claim, that would produce

a claims total of less than $5 million (9,838 x $500 = $4,919,000). Further, as Ellis observed in his letter to Central, given the "transitory nature" of our society, it was foreseeable–and particularly to counsel familiar with TCPA litigation–that many of the identifiable fax numbers would no longer be valid, thus producing a lower expected number of claims. In this context, the hypothetically prudent uninsured's decision to settle on terms that allowed millions of dollars in anticipated residual settlement funds to be donated to charity strikes us both as extraordinarily generous and extremely helpful to class counsel's quest for attorney fees. But the trial court, after considering the evidence the parties adduce on this point, will ultimately make that determination.

¶ 74     We next turn to the second reasonableness test under *Guillen*: whether a reasonably prudent person in Tracy's position would have agreed to pay $14 million to resolve the claims in *Idlas*. This test, unlike the prudent uninsured test, focuses on the particular facts and circumstances relevant to the reasonableness of Tracy's decision to agree to a $14 million settlement and, as we have noted, is guided by a "commonsense consideration of the totality of facts bearing on the liability and damage aspects of plaintiff's claim." (Internal quotation marks omitted.) *Guillen*, 203 Ill. 2d at 163.

¶ 75     Some of the considerations under both reasonableness inquiries overlap. Idlas's delay in filing suit, the chances of success on motion practice regarding defenses available to Tracy's, the parties' inability to identify more than a fraction of the recipients of Tracy's fax advertisements and predicted claimant response rates all affect the value of the claims asserted in *Idlas*. Additional factors that bear on the reasonableness of the settlement amount particular to Tracy's circumstances include whether, in fact, it was the product of arm's length negotiations, what facts were available to Ellis in the relatively short time he represented Tracy's that allowed him to reliably value the *Idlas* claims, what analysis Ellis, in fact, made of the viability of various motions he could pursue on Tracy's behalf, how Ellis assessed the likelihood that, with a single class representative asserting a claim having a maximum value of $1,500, a trial court would enter a judgment after trial in excess of $60 million, and how the parties arrived at the $14 million figure.

¶ 76     Evidence regarding Ellis's dealings with counsel for Idlas and inquiry into why he would tell Central about his plans for defending the lawsuit when he had already engaged in apparently fruitful settlement negotiations may also bear on whether the amount of the settlement was the product of good-faith negotiations. Central argues that Ellis had relationships with Idlas's counsel both before and after the *Idlas* litigation. We leave it to the trial court to determine whether this information is relevant to the reasonableness of the settlement amount. The trial court may also consider evidence regarding the factual basis for Ellis's assertion in the motion for preliminary approval that he had "analyzed the legal and factual issues presented in *Idlas*," the risks and expenses involved in pursuing the litigation to conclusion, the likelihood of a damage award in excess of $14 million, and "the likelihood, costs and possible outcomes of one or more procedural and substantive appeals." Any evidence presented in the trial court showing that there was an abdication of a true defense or that there were strategic efforts by the parties to implicate coverage up to Central's policy limits bears directly on the reasonableness of the settlement.

¶ 77     Particularly troublesome on this record is Ellis's agreement to expand the class definition to include a time period (September 1, 2002 to March 4, 2003) outside the four-year statute of limitations Idlas claimed was applicable. This expansion of the class definition resulted in the

addition of another 34,000 putative class members and, importantly, triggered a $5 million excess policy issued by Central that otherwise would have been unavailable because it expired in January 2003.

¶ 78    Tracy's argues that it had no choice but to expand the class because the pendency of *White* tolled the limitations period for other class members, thus rendering claims prior to March 3, 2003 timely. See *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 342 (1977) (commencement of class action suspended the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit continued as a class action). But this begs the question of why, with a sole class representative who received his fax on July 22, 2003, counsel for Tracy's would not have been in a position to insist (given the effect that expansion of the class definition had on the size of the class) that if plaintiffs wanted to expand the class period alleged in the complaint, they would have to identify a class member who received an unsolicited fax prior to March 5, 2003. By adopting that stance and adhering to the class as originally defined, Tracy's would have assumed the risk–presumably minimal–that an as yet unidentified fax recipient from the earlier period would come forward to file another class action. Since a substantial number of faxes were sent out during the period from September 1, 2002, to March 4, 2003, it would appear, without more, that the cost of expanding the class greatly outweighed the risk that another lawsuit would be filed. But maybe there is more and that is what the trial court will be called upon to decide.

¶ 79    Fundamentally, the amount of the *Idlas* settlement may be deemed unreasonable if there is evidence of bad faith, collusion or fraud by Tracy's. The parties have not cited and we have not located reported Illinois state court decisions addressing the circumstances under which a settlement will be deemed collusive. See *Wolf v. Maryland Casualty Co.*, 617 F. Supp. 456, 460 (S.D. Ill. 1985) (issue for jury as to whether judgment in underlying case was product of fraud and collusion created where evidence showed that counterclaim was amended to clearly fall within terms of policy and to seek damages in the amount of the policy limits, insured failed to provide amended counterclaim to insurer and insured agreed it would not contest the entry of summary judgment against it in return for a covenant to execute only against the proceeds of the policy). But courts in other jurisdictions have considered such issues so we will examine those authorities. See *Rhone v. First American Title Insurance Co.*, 401 Ill. App. 3d 802, 812 (2010) ("Although the decisions of foreign courts are not binding, 'the use of foreign decisions as persuasive authority is appropriate where Illinois authority on point is lacking or absent.' [Citations.]").

¶ 80    We recognize that collusion and fraud in the context of settlements negotiated by an insured and an underlying plaintiff are broadbrush concepts and that "[a]ny negotiated settlement involves cooperation to a degree." *Continental Casualty Co. v. Westerfield*, 961 F. Supp. 1502, 1505 (D.N.M. 1997) (citing Stephen R. Schmidt, The Bad Faith Setup, 29 Tort and Insurance L.J. 705, 728 (1994)). But a settlement "becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant. Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer. They have in common unfairness to the insurer, which is probably the bottom line in cases in which collusion is found." *Id.*

¶ 81    Collusion occurs when "the insured and a third party claimant work together to *** inflate the third party's recovery to artificially increase damages flowing from the insurer's breach" of the duty to defend. *Safeco Insurance Co. of America v. Parks*, 88 Cal. Rptr. 3d 730, 748 (Cal. Ct. App. 2009). Several factors are relevant to a determination whether a settlement is collusive, including "the amount of the overall settlement in light of the value of the case [citations]; a comparison with awards or verdicts in similar cases involving similar injuries [citations]; the facts known to the settling insured at the time of the settlement [citations]; the presence of a covenant not to execute as part of the settlement [citation]; and the failure of the settling insured to consider viable available defenses [citations]." (Internal quotation marks omitted.) *Id.*

¶ 82    Again, the trial court correctly concluded that the record presents material issues of fact as to collusion and fraud that are not appropriate for resolution on summary judgment. It will be up to the trial court to determine whether counsel for Tracy's and Idlas colluded in agreeing to a settlement in an amount, perhaps coincidentally, equal to the value of Central's insurance. Certain facts on the record before us certainly point to a finding that there was not even the illusion of adversity or arm's-length negotiations between counsel for Idlas and counsel for Tracy's. Ellis's communications with Idlas's counsel even before his substitution and before he had access to defense counsel's case file suggest the lack of a true adversarial relationship or any real effort to limit Tracy's liability or the settlement amount. More evidence will either prove or disprove these impressions.

¶ 83    The trial court correctly observed that Tracy's and Idlas's position that the $14 million figure was objectively reasonable when measured against the potential for liability in excess of $60 million (which translates to a recovery of approximately $125 per fax sent) is insufficient to sustain their burden under *Guillen*. As we have noted, the $60 million figure is overblown and the real magnitude of the risk faced by Tracy's given the factors we have enumerated above appears to be significantly less. Further, the fact that the settlement is within the limits of available insurance coverage is likewise not conclusive. *Guillen*, 203 Ill. 2d at 165.

¶ 84    Tracy's and Idlas also emphasize the risk Tracy's faced in refusing to settle and instead going to trial. But there are obviously many points along a litigation timeline when parties may pursue settlement: shortly after the case is filed (as here), after initial motion practice, after class and merits discovery, after summary judgment motions, and immediately before, during or after trial. It is not apparent on this record that the settlement was the product of Tracy's one and only chance to settle or that there was particular pressure brought to bear on Tracy's to settle early, particularly since Central–at least at that point–was paying its attorneys. Tracy's' reasons for agreeing to a $14 million settlement at virtually the earliest possible point is an appropriate topic of evidence at the reasonableness hearing.

¶ 85    Issues relative to the reasonableness of the decision to settle and the amount of the settlement, collusion, and fraud are thus reserved for a hearing before the trial court at which Tracy's and Idlas bear the initial burden of proof. The trial court may then determine whether Tracy's acted as a prudent uninsured in deciding to settle and as a reasonably prudent person in agreeing the settlement amount of $14 million. The court may also consider whether counsel in *Idlas* colluded in connection with the settlement. We therefore affirm the trial court's ruling in denying summary judgment on the issues of reasonableness, collusion and fraud.

- 18 -

¶ 86                    Central's Invocation of Other Policy Provisions

¶ 87       As noted above, in addition to challenging the settlement as unreasonable under *Guillen*, Central, because it did not breach its duty to defend Tracy's, may also invoke provisions of its policies as a bar to enforcement of the settlement against it. Idlas, as Tracy's assignee, stands in the shoes of Tracy's, and is subject to all policy defenses Central could have asserted against its insured. *Guillen*, 203 Ill. 2d at 158-59.

¶ 88       Central argues a number of these provisions on appeal. For example, Central argues that Tracy's conduct in sending faxes does not constitute an "occurrence" within the meaning of its policies because an occurrence is defined as an "accident." Central also points to a policy provision excluding coverage for property damage "expected or intended from the standpoint of the insured." Central contends that Tracy's admittedly intended to send the faxes, so that conduct is not an "accident," and necessarily anticipated that the recipient's fax machine, ink, paper and toner would be used in the process, leading to the conclusion that Tracy's "expected or intended" the property damage. Similarly, with respect to the personal and advertising injury coverage under its policies, Central invokes a provision that excludes coverage for such injury "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.' " At least one court has rejected such defenses to coverage for TCPA claims. See *Columbia Casualty Co. v. Hiar Holding, L.L.C.*, 411 S.W.3d 258 (Mo. 2013).

¶ 89       Idlas contends that the proper focus should be whether Tracy's intended to violate the TCPA and emphasizes evidence in the record that Choubmesser had been assured by third parties that the recipients of the faxes had consented to receive them. Central counters, relying on evidence that Tracy's was specifically advised by certain fax recipients in September 2002, at the outset of its fax advertising campaign, that its conduct was in violation of the TCPA.

¶ 90       Central raises additional issues, assuming that coverage exists, regarding the limits available under its policies. For example, Central argues that Tracy's fax advertising campaign constituted, at most, one "occurrence," thus triggering only the $1 million per-occurrence limits of its policies and not the $2 million aggregate limits. See *Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc.*, 333 Ill. App. 3d 871, 881-82 (2002) (single fraudulent sales campaign triggered per occurrence limits regardless of the number of individual claims or injuries). Tracy's and Idlas argue that each fax constitutes an occurrence and thus the higher aggregate limits apply.

¶ 91       Central also invokes an exclusion in the personal and advertising injury provision for claims "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." Pointing to the fact that several policy periods were involved here, Central contends that because the first publication of the offending fax occurred in 2002 prior to the policies that incepted in 2003, coverage under those later policies is excluded. Again, Tracy's and Idlas argue that each fax constituted a separate "publication" so that any publication during a policy period triggers coverage.

¶ 92       Although Central invites us to resolve these and other issues regarding the applicability of policy provisions and exclusions, the trial court has not yet had the opportunity to consider many of them. Central points out that the trial court has already addressed the applicability of certain of these policy provisions in another ruling denying Central summary judgment. But given the many factual issues raised by Central's invocation of these policy provisions, we find no error in the denial of Central's motion for summary judgment on this basis. Further, if the

trial court finds that the *Idlas* settlement was unreasonable under *Guillen*, it will be unnecessary to consider Central's policy defenses. Thus, on remand Central may raise such issues in connection with any hearing to determine whether it is bound by the *Idlas* settlement.

¶ 93                            The Effect of Central's "buy-out" of Coverage for
                                     Personal and Advertising Injury

¶ 94        Central also challenges the denial of its motion for summary judgment on the issue of the effect of the "buy-out" of the "personal and advertising injury" coverage under the *White* settlement agreement. Central claims the trial court erroneously concluded that Central and Tracy's could not alter the availability of this coverage because Idlas's rights under the policies had already vested prior to the time *White* was settled.

¶ 95        As we recite above, Tracy's and Central settled *White* in 2005 after negotiating dismissal of the class representatives' individual claims in exchange for a total payment of $12,000. In a separate agreement, Tracy's also agreed to release Central from any claims–past, present or future–for coverage under the "advertising injury" and "personal and advertising injury" provisions of Central's policies and agreed that the policies were reformed to exclude such coverage. The terms of the settlement between Tracy's and Central were confidential.

¶ 96        In denying Central's motion, the trial court ruled that the agreement between Tracy's and Central was not binding on Idlas because Idlas's rights as a third party beneficiary of the insurance contracts had vested before modification of those contracts to eliminate coverage for "personal and advertising injury." The trial court based its decision on *Reagor v. Travelers Insurance Co.*, 92 Ill. App. 3d 99, 103 (1980), which held that an "injured person has rights under the [insurance] policy which vest at the time of the occurrence giving rise to his injuries." The trial court ruled that Idlas's rights vested on July 22, 2003, when he received the unsolicited fax, and Central and Tracy's could not "agree to divest Idlas in a secret contract concluded in November of 2005." We disagree with this conclusion.

¶ 97        Central argues that our supreme court's ruling in *Olson v. Etheridge*, 177 Ill. 2d 396 (1997), overruled *Reagor*, without explicitly so stating, in that *Olson* rejected the rule that third party contract beneficiary rights vest immediately. The supreme court in *Olson* specifically adopted the third party beneficiary vesting rule under the Restatement (Second) of Contracts, section 311, which outlines the preconditions to the vesting of a third party beneficiaries' rights under a contract. Restatement (Second) of Contracts § 311(3) (1981). In *Olson*, our supreme court expressly overruled the vesting rule as formulated in *Bay v. Williams*, 112 Ill. 91 (1884), *i.e.*, that the rights of a third-party beneficiary under a contract vest immediately and cannot be altered or extinguished by a later modification of the contract by the original parties unless the beneficiary assents. *Olson*, 177 Ill. 2d at 408-09.

¶ 98        In *Olson*, the supreme court noted that the rationale underlying section 311's vesting rule is that " 'parties to a contract should remain free to amend or rescind their agreement so long as there is no detriment to a third party who has provided no consideration for the benefit received.' *Board of Education of Community School District No. 220 v. Village of Hoffman Estates*, 126 Ill. App. 3d 625, 628 (1984)." *Id*. at 410. The *Olson* court observed that, in contrast, the vesting rule of *Bay* curtails the freedom to contract. *Id*. at 411. Section 311 was thus adopted in Illinois, establishing the rule that, "in the absence of language in a contract making the rights of a third-party beneficiary irrevocable, the parties to the contract 'retain power to discharge or modify the duty by subsequent agreement,' without the third-party

beneficiary's assent, at any time until the third-party beneficiary, without notice of the discharge or modification, materially changes position in justifiable reliance on the promise, brings suit on the promise or manifests assent to the promise at the request of the promisor or promisee." *Id*. at 408-09 (quoting Restatement (Second) of Contracts § 311(2) (1981)).

¶ 99    Although Central argues that *Olson* effectively overruled *Reagor*, we conclude that these decisions are consistent and easily harmonized. As an initial matter, we note that *Reagor* is distinguishable on its facts. In *Reagor*, after the plaintiff filed suit as a result of injuries sustained in a man-made lake created by Travelers' insured, Travelers undertook the defense of the case. *Reagor*, 92 Ill. App. 3d at 101. While the suit was pending, Travelers and its insured agreed that there was no coverage under Travelers' policy. *Id*. Under those circumstances, the court concluded that the agreement between Travelers and its insured was not binding on the injured party. *Id*. at 102. The same result would obtain under a Restatement analysis. Because section 311 creates an exception to the ability of contracting parties to modify the contract where the injured party (third party beneficiary) has already commenced suit, the result in *Reagor* would be the same even after the decision in *Olson* and the adoption of section 311. Thus, we need not find that *Olson* overruled *Reagor*.

¶ 100   Turning to the facts of this case, it is clear that Idlas does not fall within any arguably applicable exception in section 311. Prior to the modification of Central's policies by agreement between Central and Tracy's in 2005, Idlas had not materially changed his position in justifiable reliance on the existence of coverage or brought suit for the TCPA violation. Under these circumstances, because it is undisputed that prior to March 2007, Central and Tracy's were unaware of Idlas's claim and in November 2005 (well over two years after the last fax was sent) they may well have concluded that no further claims were likely to or could be filed, nothing prevented them from agreeing to the buyout of personal and advertising injury coverage under Central's policies. Certainly on this record it cannot be said that Central and Tracy's acted together, as in *Reagor*, to *defeat* Idlas's rights under the policies since it is apparent that the contracting parties were unaware of Idlas's claim due to his delay in asserting it.

¶ 101   Tracy's relies on cases decided in the context of automobile liability insurance and argues that, like parties injured in automobile accidents, we should find that Idlas's injury, sustained on July 22, 2003, precluded Central and Tracy's from modifying Central's policies to eliminate coverage for personal and advertising injury over two years later, in 2005. *Skidmore v. Throgmorton*, 323 Ill. App. 3d 417 (2001) (citing *Reagor* in holding that insurer and insured cannot agree to an automobile policy interpretation that coverage was limited under an antistacking provision and thus, automobile accident victim could raise the issue of ambiguity against the insurer); *Chandler v. Doherty*, 299 Ill. App. 3d 797, 805 (1998) (citing *Reagor* and others for the position that a claimant in the underlying action is a necessary party because such claimants are a " 'real party in interest to the liability insurance contract' whose rights 'vest at the time of the occurrence giving rise to his injuries' " (quoting *Reagor*, 92 Ill. App. 3d at 103)); *Universal Casualty Co. v. Lopez*, 376 Ill. App. 3d 459, 467 (2007) (holding that insured's default in failing to answer automobile insurer's complaint could not be attributed to nondefaulting injured third party defendants). But these cases and others emphasize Illinois' strong public policy in favor of mandatory liability insurance for those operating automobiles on our State's roadways. For example, in *People ex rel. Terry v. Fisher*, 12 Ill. 2d 231 (1957), our supreme court referred to the specific statutes that had been passed in Illinois "that confer

an interest in such a[n] [auto insurance liability] policy on every member of the public that is negligently injured, and by the unique characteristics of a liability insurance policy." *Id*. at 237.

> "Section 388 of the Insurance Code [citation] requires certain standard provisions to be included in liability policies affording injured persons a right of action against the insurer if execution against the insured is returned unsatisfied; section 58(k) of the Motor Vehicle Act [citation] provides certain minimum liability insurance coverage for motor vehicles; and section 16 of the Truck Act [citation] requires motor carriers to have specified liability insurance policies before permits may be issued. Moreover, we have construed section 388 of the Insurance Code to be declarative of the public policy of this State to protect persons injured by the negligent operation of motor vehicles, and as conferring rights which cannot be defeated after the accident by the concerted action of the insured and the insurer. [Citation.] It is clear that the legislature, by virtue of the foregoing enactment, has placed liability insurance in a category distinct from the insured's other assets so far as persons injured by the negligent operation of his motor vehicle are concerned." *Id.* at 237-38.

¶ 102    Similarly, in *Gothberg v. Nemerovski*, 58 Ill. App. 2d 372, 385 (1965), the court noted the significance of automobile insurance in society and held that the injured plaintiffs could sue the insurer directly after obtaining judgment against the insured. The court held that "[t]he procuring of automobile public liability insurance of the type contemplated has connotations extending to the general public above and beyond the private interests of the two contracting parties." *Id*. at 386.

¶ 103    In *M.F.A Mutual Insurance Co. v. Cheek*, 34 Ill. App. 3d 209 (1975), *aff'd*, 66 Ill. 2d 492 (1977), the court ruled that injured claimants are necessary parties in a declaratory judgment action and thus the insured's violation of the cooperation clause could not serve as a defense to coverage unless there was proof of substantial prejudice to the insurer. In making this ruling, the court summarized the Illinois public policy as to automobile insurance policies and differentiated the character of the automobile insurance policy. *Cheek*, 34 Ill. App. 3d at 215-18. In the supreme court's ruling in *Cheek*, the court noted the character of an automobile insurance policy, stating the automobile insurance policy "is more than a private agreement between the insured and the insurer against losses sustained as a result of the negligent operation of a motor vehicle." *Cheek*, 66 Ill. 2d at 500-01. Rather, such policies " 'abound with public policy considerations, one of which is that the risk-spreading theory of such policies should operate to afford to affected members of the public–frequently innocent third persons–the maximum protection possible consonant with fairness to the insurer.' " *Id*. at 501 (quoting *Oregon Automobile Insurance Co. v. Salzberg*, 535 P.2d 816, 819 (Wash. 1975)).

¶ 104    The cases relied upon by Tracy's thus establish that in Illinois, statutes and public policy provide certain rights to persons injured as a result of an automobile accident. While such reasoning could also be extended to cases involving professions subject to mandatory insurance requirements, such as doctors or lawyers, Tracy's and Idlas point to no corresponding public policy requiring those who advertise their businesses through electronic transmissions to carry liability insurance to cover the possibility that those to whom the advertisements are transmitted have not consented to receive them. Indeed, as noted by this court on remand in *Lay*, requiring insurance companies to cover damages awarded as a result of a TCPA violation potentially undermines Congress's intent to discourage *senders* of unsolicited faxes who can pass the cost of violations on to their insurance carriers. *Standard*

*Mutual Insurance Co. v. Lay*, 2014 IL App (4th) 110527-B, ¶ 23. Therefore, we are not persuaded that cases involving the interests of parties injured in automobile accidents in policies of liability insurance compel a different result in the context of this case.

¶ 105     While we conclude that *Reagor* does not preclude us from giving effect to the agreement between Tracy's and Central to eliminate the personal and advertising injury coverage under Central's policies, we nevertheless affirm the denial of summary judgment to Central on this ground for two reasons. First, as we have noted, the agreement between Central and Tracy's is not in the record. We cannot accept Central's representations as to the contents of that agreement without having an opportunity to examine the entirety of the document. Second, even if the agreement was in the record, we would nevertheless affirm given that we cannot determine, as a matter of law, that the amount paid by Central was adequate consideration for the buyout of the personal and advertising injury coverage. The evidence may support a finding that in September 2005, more than two years after Tracy's fax advertisement campaign ended and after the parties had the opportunity to conduct discovery in *White*, Central and Tracy's reasonably believed that no further TCPA or related claims were likely to be filed. If that is the case, then the buyout would appear to be supported by adequate consideration and it would therefore be effective as against Idlas. But on this record, we are unable to predict what the evidence will show on this issue and thus we affirm the denial of summary judgment to Central.

¶ 106                                    CONCLUSION

¶ 107     We reverse the order of the circuit court of Cook County granting summary judgment to Central based on an intervening change in the law. We affirm the orders denying Central's motions for summary judgment and remand for further proceedings consistent with this opinion.

¶ 108     Reversed in part and affirmed in part; cause remanded.