NOTICE
Decision filed 04/05/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 160098

NO. 5-16-0098

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| ROGERS CARTAGE COMPANY, PHARMACIA CORPORATION, and SOLUTIA, INC., | ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 11-MR-27 |
| THE TRAVELERS INDEMNITY COMPANY and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | ) ) ) ) | Honorable Brian A. Babka and Honorable Heinz M. Rudolf, |
| Defendants-Appellants. | ) | Judges, presiding. |

_____

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Justice Chapman concurred in the judgment and opinion.
Justice Cates dissented, with opinion.

**OPINION**

¶ 1     This appeal is a consolidation of two declaratory judgment actions related to insurance coverage for environmental contamination and cleanup at two United States Environmental Protection Agency (EPA) Superfund sites located mainly in the Village of Sauget (Sauget) and the Village of Cahokia (Cahokia). Claims were brought against plaintiffs, Pharmacia Corporation (Pharmacia) and Solutia, Inc. (Solutia) (formerly Monsanto Company), *inter alia*, in underlying litigation (United States v. Pharmacia Corp., No. 99-63-GPM (S.D. Ill.)) in federal court in the Southern District of Illinois pursuant to the Comprehensive Environmental Response,

1

Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 *et seq.* (2000)). The underlying litigation involves numerous direct claims and claims for contribution arising out of or relating to environmental response costs already expended, being expended, and/or to be expended in the future in connection with the two sites.

¶ 2 Rogers Cartage Company (Rogers), a commercial trucking company, was initially sued as a third-party defendant, but the United States soon added direct claims against Rogers under CERCLA. After the United States failed to prove its case against Rogers, the district court dismissed the claims that private parties, including Pharmacia and Solutia, filed against Rogers. The district court found such claims barred as a result of the trial outcome.

¶ 3 In 2007, there was a major shift in the interpretation of CERCLA when the United States Supreme Court found that a defendant in a toxic cleanup of a Superfund site can file a cross-claim against a fellow defendant. *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007). Pharmacia and Solutia then filed a third-party claim against Rogers, essentially arguing that Rogers's handling of toxic materials, disposal of cleanup waste, and deposit of those wastes in pools was the cause of the toxic environmental situations in Sauget and Cahokia.

¶ 4 The instant appeal pertains to plaintiffs' assertion that defendants, The Travelers Indemnity Company and Travelers Property Casualty Company of America (collectively, Travelers), were obligated to defend and indemnify Rogers in the underlying litigation pursuant to certain insurance policies issued by Travelers. Travelers disagreed and filed an action for declaratory judgment in the circuit court of Cook County (No. 10-CH-55238). Ultimately, a settlement in the amount of $7.5 million was reached in the underlying litigation without the consent of Travelers. After Rogers signed the settlement, plaintiffs filed suit for declaratory judgment in the circuit court of St. Clair County (No. 11-MR-27).

2

¶ 5    The Cook County and St. Clair County cases proceeded simultaneously. However, the bulk of the Cook County lawsuit was transferred to St. Clair County, where the trial court agreed with plaintiffs and granted partial summary judgments in favor of plaintiffs and against Travelers and granted Rogers's petition for fees, costs, and penalties. Travelers now appeals. The specific issues raised in this appeal are (1) whether Travelers breached the duty to defend, (2) whether the pollution exclusions in the policies apply, (3) whether the settlement in the underlying litigation was reasonable, (4) whether Travelers breached the good faith duty to settle, (5) whether Travelers' conduct was vexatious and unreasonable such that an award of attorney fees was proper, and (6) whether the award of $2,665,384.90 in attorney fees was proper. We affirm.

¶ 6                                    BACKGROUND

¶ 7    Rogers's business includes hauling toxic and hazardous materials. After delivery of such materials, the interior and exterior of its tank trailers are cleaned at trucking terminals. During the 1950s through the 1970s, Rogers operated terminals in Cahokia and Sauget. Rogers first used the Cahokia Terminal, where it used containment ponds for the hazardous materials, but moved to Sauget in 1970, where it utilized the sewer system to transport truck washing waste to the local publicly owned treatment works (POTW). The underlying litigation pertained to two CERCLA Superfund sites, Sauget Area 1 and Sauget Area 2, both named and identified by the EPA.

¶ 8    Area 1 includes three closed landfills (Sites G, H, and I), two former surface impoundments (Site L), one formerly flooded borrow pit that is now filled (Site M), one filled borrow pit (Site N), Dead Creek, and Borrow Pit Lake Area, located within the corporate limits of Sauget and extending into Cahokia and extending west of Illinois Route 3, as well as all other areas immediately adjacent or contiguous thereto. Area 2 includes four closed landfills (Sites P,

3

Q, R, and S) and sludge dewatering ponds (Site O), as well as the contamination in soils, sediment, surface water, leachate, and groundwater located or released therein. Area 2 sites are located within Sauget and extend into Cahokia and East St. Louis. To the extent the contamination has spread from Area 1 to Area 2, any contamination from the Area 1 site is included in the definition of Area 2.

¶ 9    Rogers was first sued in the underlying litigation in the United States District Court for the Southern District of Illinois (district court) as a third-party defendant (United States v. Pharmacia Corp., No. 99-63-GPM (S.D. Ill.)). The United States later added direct claims against Rogers. The claims alleged Rogers operated truck terminals and truck washing facilities from which hazardous substances were released into the environment. The underlying litigation involved numerous parties and millions of dollars.

¶ 10    Beginning in 1960 and over the course of the next several years, Travelers issued policies of insurance to Rogers which required that, in the event of litigation against Rogers and/or if Rogers became legally obligated to pay damages because of bodily injury or property damage as defined in the policies, Travelers would defend and indemnify Rogers. When Rogers was sued in the underlying litigation, it asked Travelers to defend and to indemnify it pursuant to the policies Rogers purchased from Travelers. In a letter dated June 30, 2000, Travelers (1) agreed to "contribute to the payment of reasonable and necessary fees for defense-related work performed by counsel of Rogers' choice," subject to a reservation of rights, and (2) identified 20 policies pursuant to which it agreed to fulfill its duty to defend.

¶ 11    Attorney Rob Schultz was Rogers's defense counsel of choice throughout the underlying litigation. An opportunity to settle the underlying litigation for $3.54 million arose before the United States was to try its first claims against Rogers and Paul Sauget (Mr. Sauget) (now

4

deceased) in the district court in 2003. At that time, Travelers sent Rogers a letter in which it advised Rogers that Rogers "act in a manner that will best protect its interests with respect to any settlement opportunity." Travelers went on to advise that it would "not consider any resolution which may be reached by Rogers Cartage to be in violation of any policy conditions prohibiting voluntary payment or assumption of obligation." Rogers did not settle, but proceeded to trial.

¶ 12    Mr. Sauget settled during trial. His settlement took the form of a consent decree with the United States. Mr. Sauget's liability was fixed at $9.2 million, of which he paid $60,000 and agreed to pursue insurance for the remainder.

¶ 13    Because the United States failed to comply with disclosure rules, the district court barred several witnesses from testifying, and the United States was unable to meet its burden of proof. In 2004, the district court dismissed the section 113 CERCLA claims that private parties, including Pharmacia and Solutia, filed against Rogers on the basis that such claims were contribution claims barred as a matter of law due to the trial outcome. While the underlying litigation remained open, there were no longer any claims against Rogers.

¶ 14    In 2009, Pharmacia, Solutia, and others (referred to collectively hereinafter as claimants) sought leave to file direct cost recovery claims against Rogers in the underlying litigation for cleanup of Area 1 pursuant to the new interpretation of CERCLA following the Supreme Court's decision in *Atlantic Research Corp*., 551 U.S. 128. On January 20, 2010, the district court granted leave to claimants to file section 107 CERCLA claims over Rogers's objection. The district court later determined the claims against Pharmacia and Solutia could proceed.

¶ 15    Rogers tendered the claims to Travelers. In a letter dated May 28, 2010, Travelers once again agreed to contribute to the payment of reasonable and necessary fees for Rogers's defense in the underlying litigation, but reserved its right to contest coverage. Travelers specifically

stated that the defense could be conducted by counsel of Rogers's choice "in any manner deemed appropriate to protect the interests of Rogers." Travelers agreed to fulfill its duty to defend Rogers under the 20 policies previously identified.

¶ 16    Travelers later confirmed it issued two additional policies covering the period 1965-67. The combined policy limits of the 22 policies are $7.3 million. There is an issue regarding allegedly lost/missing policies that has been retained by the circuit court of Cook County and is not an issue in this appeal. The policies issued by Travelers between 1960 and 1970 do not contain pollution exclusions; the policies issued by Travelers between 1971 and 1986 contain pollution exclusions that are applicable only if the pollution was "expected or intended" from the policyholder's viewpoint.

¶ 17    Rogers again chose Schultz as independent counsel. Prior to a status conference on August 30, 2010, claimants told Rogers they had new evidence allegedly connecting Rogers's operations at the Cahokia Terminal to polychlorinated biphenyl (PCB) contamination in Dead Creek, which had been cleaned up at a cost of $30.3 million. In particular, claimants possessed an updated environmental sampling by Dr. Menzie connecting Rogers's operations at the Cahokia Terminal to contamination in Dead Creek. Claimants also alleged Rogers once owned portions of Area 1.

¶ 18    Claimants presented evidence that future cleanup costs would be over $21 million. In addition to Area 1 cleanup costs, claimants presented evidence that (1) $40 million had already been spent on groundwater remediation for Area 1 and Area 2 together, (2) further groundwater remediation was expected to cost an additional $2 to $3 million per year, and (3) Rogers's damages would be at least $10 million, excluding groundwater. Rob Schultz told claimants' counsel they would need time to conduct discovery on this new evidence.

6

¶ 19    During the status conference on August 30, 2010, the district court set a trial date of January 31, 2011. The district court also ordered Rogers to share financial information with Pharmacia and Solutia regarding Rogers's solvency in an attempt to facilitate settlement discussions. Ultimately, the financial information Rogers shared showed it could not withstand an adverse judgment in the case and remain solvent without insurance coverage.

¶ 20    On September 9, 2010, Rogers informed Travelers of the January 31, 2011, trial date and that Rogers was planning to have an informal settlement meeting with the underlying claimants. Schultz told Travelers he would advise Travelers when Rogers received a settlement demand.

¶ 21    On September 27, 2010, another status conference was held during which the parties informed the court that they had made significant progress toward settlement. The district court encouraged the parties to continue to work toward a settlement, with the court adding, "It would be nice if Rogers Cartage can stay in business, too." The court issued an order directing the parties to file a joint status report by October 29, 2010.

¶ 22    On October 8, 2010, claimants sent Rogers a letter in which they proposed settling for $4 million if Travelers would participate and resolve the claims for cash. If Travelers refused to participate, claimants proposed Rogers settle on its own for $7.5 million, with Rogers paying $50,000 and promising to pursue insurance proceeds for the remainder using Pharmacia and Solutia's counsel. In addition, Pharmacia and Solutia would share 10% of any sums recovered in excess of $5 million and 15% of any sums recovered in excess of $6 million. Negotiations continued.

¶ 23    On October 12, 2010, Travelers requested by letter "copies of all pertinent correspondence." Travelers never received a copy of the October 8 demand letter. On October 29, 2010, the parties filed a joint status report in which they reported continuing serious

7

negotiations. On November 2, 2010, claimants sent a letter in which they renewed their demand of $4 million to be paid by Travelers. This letter did not contain any reference to the $7.5 million alternative proposal. Another letter was sent on November 3, 2010, and was forwarded to Travelers. Travelers subsequently asked Rob Schultz for his evaluation of the case.

¶ 24    On November 16, 2010, Schultz sent Travelers his evaluation of the case. While he characterized some of the allegations as "weak," he told Travelers the allegations relating to groundwater contamination were "moderately strong." Schultz specifically discussed the testing by claimants that showed a trail of PCBs from the Cahokia property to Dead Creek and proclaimed these allegations "a winner" for claimants. Schultz advised Travelers that pursuant to section 107 of CERCLA, claimants would be entitled to judgment for all of their response costs if they could show one tablespoon of contamination originated from Rogers's operations.

¶ 25    Schultz told Travelers he thought the $4 million demand was reasonable in light of the fact that cleanup costs exceeded $30 million, but he believed the litigation could be settled for between $2 and $3 million. He advised Travelers he did not think he could win at the trial level but also advised Travelers he thought there was at least an 85% percent chance of ultimately prevailing on appeal even if contamination was proven since Solutia had already been sued by and settled with the EPA and the previous section 113 claims against Rogers had been dismissed. Schultz told Travelers that Rogers could not sustain and satisfy even a $1 million judgment and that "[t]his is a bet the company case," meaning the company could neither afford to go to trial nor afford to lose. In his deposition, Schultz noted Rogers would be unable to post bond should the case go to the Seventh Circuit for review. Schultz concluded there were only two reasonable options: (1) negotiate and settle with Solutia or (2) indemnify Rogers and post the bond on appeal.

8

¶ 26    On November 19, 2010, Travelers sent a letter to Rogers in which it disputed coverage, noted the trial date, and requested a meeting with claimants' counsel. Travelers asserted Rogers had "less than $300,000" in applicable coverage and explained this coverage amount assumed that the partial pollution exclusions in the policies from 1971 to 1986 would preclude coverage for Rogers.

¶ 27    A settlement meeting took place on December 14, 2010, during which Travelers made a counteroffer of $275,000 to claimants' $4 million demand. Claimants rejected the counteroffer and countered at $3.75 million. Rogers's in-house counsel, Michelle Larson, sent an e-mail to Travelers on December 28, 2010, in which she said claimants might settle with Travelers for around $2 million. Both Larson and Schultz testified in their depositions that Rogers preferred to settle with Travelers' participation over the alternative $7.5 million settlement that would require Rogers to give up a number of its insurance policies.

¶ 28    On December 30, 2010, Travelers sent Rogers a letter in which it rejected the $3.75 million demand, acknowledged claimants would likely settle at $2 million, but refused to make a counteroffer. The letter went on to state that (1) if Rogers was "contemplating entering into a settlement on its own, please be advised that Rogers *** does so at its own peril," (2) Travelers was retaining the right to control the defense of the litigation, which included any settlement, and (3) it did not consent to Rogers's unilateral settlement negotiations with claimants. Travelers concluded by telling Rogers that if it was negotiating or already negotiated a settlement, Travelers would consider that a breach of the cooperation and anti-assignment clauses in its policies and such actions could negate coverage that might otherwise have been available. Travelers then filed suit in Cook County, seeking, *inter alia*, a declaration of no coverage under its policies.

9

¶ 29    On January 7, 2011, the parties filed a joint status report in which they informed the district court that it was likely Travelers was not going to contribute in any meaningful way toward a settlement, but the parties were nevertheless trying to resolve the matter without Travelers' participation. Ultimately, Rogers settled for $7.5 million, out of which it agreed to pay $50,000 and promised to seek reimbursement of the remainder through Travelers.

¶ 30    The agreement further provides that any money recovered from Travelers would first be used to reimburse Rogers's coverage counsel (up to $3 million) for recovering the $7.45 million and to reimburse Rogers for any retrospective premiums to Travelers. Any money recovered in excess of these amounts is to be divided between claimants as follows: (1) if the excess is greater than $3 million, Rogers receives 40% and the other claimants receive 60%; (2) if less than $3 million, Rogers receives 45%. On April 27, 2011, the district court approved the settlement agreement, without objection from Travelers.

¶ 31    On February 4, 2011, Rogers, Pharmacia, and Solutia filed the instant action in the circuit court of St. Clair County seeking, *inter alia*, a declaration of coverage. The settling parties also sought to have the Cook County case filed by Travelers in December 2010 dismissed pursuant to section 2-619(a)(3) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(3) (West 2010)) or transferred on the grounds of *forum non conveniens*. The motion to dismiss or transfer was initially denied by the circuit court of Cook County, and both the St. Clair County action and the Cook County action were allowed to proceed. Travelers then filed a motion to dismiss the St. Clair County action pursuant to sections 2-619(a)(3) and (9) of the Code (*id.* § 2-619(a)(3), (9)) and on *forum non conveniens* grounds. On May 16, 2012, the circuit court of St. Clair County denied the motion. Travelers sought an interlocutory appeal of that ruling, which this court declined to hear.

¶ 32    Rogers filed a motion for partial summary judgment seeking a finding that it did not breach any terms of the Travelers policies by settling without Travelers' consent. In response, Travelers filed a cross-motion for partial summary judgment on the basis the settlement agreement was collusive. Rogers also filed two motions for partial summary judgment in St. Clair County. On May 3, 2012, the circuit court of St. Clair County granted partial summary judgment in favor of Rogers, finding that (1) Travelers breached its good faith duty to settle and (2) the underlying settlement was reasonable.

¶ 33    The circuit court of St. Clair County issued a supplemental order on May 2, 2013, which addressed the issue of collusion. The trial judge noted Travelers' objection to any findings by the St. Clair County court on the issue of collusion but found that because the term "collusion" was mentioned 30 times and "collusive" was mentioned 4 times during the March 21, 2013, hearing on the motion for partial summary judgment, the issue was argued and a ruling on that issue was appropriate. Travelers filed two motions to reconsider the May 2 order, both of which were denied.

¶ 34    On May 21, 2014, the circuit court of Cook County denied Travelers' motion for partial summary judgment on the issue of collusion, finding that the "St. Clair Order effectively resolves the issues raised in the parties' cross-motions in this action." The circuit court of Cook County further found that Rogers did not need Travelers' consent to settle and did not breach any policy terms by settling, and it granted Rogers's renewed *forum non conveniens* motion and transferred the declaratory action to St. Clair County but severed and retained the issue of the allegedly lost/missing insurance policies.

¶ 35    Rogers also filed a motion for partial summary judgment, seeking rulings that Travelers breached its duty to defend Rogers and, therefore, Travelers should be estopped from asserting

11

defenses to coverage and seeking damages against Travelers pursuant to section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2012)), including attorney fees and costs spent prosecuting the coverage action. Travelers responded by moving for partial summary judgment seeking a declaration that under those policies containing a pollution exclusion it did not have a duty to defend or indemnify Rogers in the underlying litigation.

¶ 36    On December 12, 2014, the circuit court of St. Clair County entered an order granting Rogers's motion for partial summary judgment regarding estoppel and damages, specifically finding Travelers (1) breached its duty to defend Rogers (2) is estopped from disclaiming indemnity coverage, and (3) must indemnify Rogers in the underlying settlement. The trial court denied Travelers' motion for partial summary judgment regarding the pollution exclusions, finding that since Travelers was estopped from raising defenses to coverage, it could not enforce the pollution exclusions contained in the policies. The trial court went on to find that even if Travelers was not estopped from asserting the pollution exclusions as a defense, such exclusions were inapplicable in light of their language, precedent, and undisputed facts.

¶ 37    Finally, the trial court awarded Rogers $2,665,384.90 in attorney fees and costs expended through January 31, 2015, and an additional $60,000 penalty pursuant to the Insurance Code. The trial court did not preclude Rogers "from seeking additional fees and costs incurred after January 31, 2015, or that will be incurred in the future." Travelers filed a timely notice of appeal.

¶ 38                                ANALYSIS

¶ 39                            I. Duty to Defend

¶ 40    The first issue we are asked to address is whether Travelers breached its duty to defend Rogers. Travelers contends the trial court found Travelers breached its duty to defend simply because it sent the December 30, 2010, reservation of rights letter and filed an action to

12

adjudicate coverage but insists this is something all insurers typically do. Because Travelers paid for Rogers's defense both before and after the letter was sent and did not take over Rogers's settlement with the underlying claimants, Travelers argues it did not breach the duty to defend. Rogers responds that Travelers used the threat of negating coverage in an attempt to force Rogers from settling, even though Travelers had no legal basis on which to stop Rogers from settling, and that this is contrary to Illinois law and constitutes a breach of the duty to defend. We agree with Rogers.

¶ 41    It is well settled in Illinois that a reviewing court will conduct a *de novo* review of an appeal from the grant of a summary judgment. See *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). The determination of the rights and obligations under an insurance policy is a question of law that is appropriate for disposition by way of summary judgment. See *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). A court must construe the policy as a whole and determine the intentions of the parties based on the policy's express terms, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, and the subject matter that is insured, along with the purposes of the entire contract. See *id.*

¶ 42    "An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." *Conway v. Country Casualty Insurance Co.*, 92 Ill. 2d 388, 393 (1982). The duty to defend is much broader than the duty to indemnify

13

because the duty to defend is triggered if the complaint potentially falls within a policy's coverage, whereas the duty to indemnify is triggered only when the resulting loss or damage comes within a policy's coverage. *Country Mutual Insurance Co. v. Bible Pork, Inc.*, 2015 IL App (5th) 140211, ¶ 16. Both the underlying complaint and the insurance policy should be liberally construed in favor of the insured and against the policy's drafter, the insurance company. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 74 (1991).

¶ 43   When the United States first sued Rogers in 2000, Travelers agreed to defend Rogers under a reservation of rights. Travelers allowed Rogers to pick counsel of Rogers's choice. Rogers hired Rob Schultz to defend in the underlying litigation. Travelers told Rogers "the defense may be conducted in any manner deemed appropriate to protect the interest of Rogers Cartage." Schultz has continued to defend Rogers throughout the litigation.

¶ 44   In the first trial conducted in 2003, the United States was unable to meet its burden of proof after the district court barred several witnesses from testifying. Rogers won that case; however, based upon a new interpretation of CERCLA following the Supreme Court's decision in *Atlantic Research Corp.*, 551 U.S. 128, the underlying claimants were allowed to bring direct claims against Rogers. In a letter dated May 28, 2010, Travelers again agreed to pay reasonable and necessary defense-related fees and stated "that defense may be conducted by qualified counsel of Rogers Cartage's choice, in any manner deemed appropriate to protect the interests of Rogers Cartage" under reservation of right to contest coverage.

¶ 45   During a status conference on August 30, 2010, the district court set a trial date of January 31, 2011. Rogers's financial status was also discussed. The district court encouraged the parties to settle and to share damage information. The district court also ordered Rogers to share

financial information with claimants. At the next status conference on September 27, 2010, the parties told the court significant progress had been made. The district court noted that it "would be a major accomplishment" if the parties could reach a settlement and added, "It would be nice if Rogers Cartage can stay in business, too." The trial court ordered the parties to continue negotiations and file a joint status report by October 29, 2010.

¶ 46 On October 8, 2010, claimants sent Rogers a letter detailing their case and proposing a $4 million settlement if Travelers was a participant and a $7.5 million settlement, with Rogers paying $50,000 out of pocket and the claimants obtaining the right to go after Travelers for the remaining funds. Rogers did not forward the letter to Travelers. On October 29, 2010, the parties reported they were in serious settlement discussions. On November 2, 2010, claimants sent a letter in which they renewed their demand for payment of $4 million by Travelers. The alternative settlement offer was not mentioned in that letter. Rogers forwarded this letter to Travelers. Both Michelle Larson and Rob Schultz testified during depositions in this matter that Rogers preferred to settle with Travelers over the alternative $7.5 million settlement, as the $7.5 million settlement would require Rogers to give up a number of its policies.

¶ 47 After receiving the letter, Travelers sought an evaluation of the underlying case from Rob Schultz. Schultz advised Travelers there was a strong case against Rogers with regard to groundwater contamination. New testing completed after the first trial in 2003 showed a trail of PCBs from the Cahokia property to Dead Creek, located within Area 1. Schultz further advised Travelers that, pursuant to section 107 of CERCLA, if claimants could show that even one tablespoon of contamination originated from Rogers's operation, claimants would be entitled to a judgment for all their response costs, which, at that point, were over $30 million.

15

¶ 48    In his deposition, Schultz said he was getting the impression the district court "was inclined to enter judgment against us if the evidence was as he expected or as [Solutia] was saying." Schultz specifically stated he was attempting "to find another source for those PCBs," but he "could not." Schultz advised Travelers that not only was the $4 million demand reasonable but also that claimants would likely agree to a counteroffer of between $2 and $3 million. He further advised Travelers that Rogers would not be able to satisfy a judgment anywhere near $1 million. Finally, Schultz advised Travelers that with an expected judgment of at least several million dollars and potentially in excess of $50 million, there were only two viable options: (1) negotiate and settle with claimants or (2) indemnify Rogers, go to trial, and post the bond for appeal to the Seventh Circuit.

¶ 49    After receiving Schultz's evaluation, Travelers sent a letter to Rogers in which Travelers disputed coverage, noted the upcoming trial date, and requested a meeting with claimants' counsel. On December 14, 2010, a meeting took place in which Travelers counteroffered $275,000. Claimants rejected the counteroffer and countered at $3.75 million, stating it did "not intend to reduce the demand any further." Michelle Larson, Rogers's in-house counsel, sent an e-mail to Travelers in which she urged Travelers to split the difference and settle the litigation.

¶ 50    Rather than settling the case, Travelers sent a reply to Ms. Larson in which it stated it could not understand why Rogers believed claimants would take around $2 million to settle the case in light of the claimants' stated position that they did not intend to reduce the demand further. Travelers said it was neither willing to settle the case nor make another counteroffer but would continue to defend Rogers, subject to reservation of rights. Travelers went on to state:

> "In addition, Travelers remains ready and willing to discuss settlement as this matter progresses and, of course, Travelers will consider any and all reasonable settlement

16

demands. However, to the extent that Rogers Cartage is contemplating entering into a settlement on its own, please be advised that Rogers Cartage does so at its own peril. If, in fact, Rogers Cartage is negotiating (or has already negotiated) a settlement with Claimants, such actions would (at a minimum) constitute a breach of the cooperation and anti-assignment clauses contained in the Travelers Policies and could well negate any coverage otherwise available under the Travelers Policies."

In the instant case, all parties were well aware that an adverse verdict was possible in the underlying litigation and that damages could exceed policy limits. Despite this fact, Travelers refused to settle within the policy limits and sent a letter in which it informed Rogers that coverage would be negated if Rogers agreed to a settlement.

¶ 51 The circuit court of St. Clair County concluded that "Travelers' purpose in sending this letter was to try to put a stop to negotiations." Similarly, the circuit court of Cook County determined that the letter was an attempt to intimidate Rogers to go to trial. We agree with both courts and find the only conclusion to be drawn from the letter is that Travelers wanted to intimidate Rogers and put a stop to negotiations. However, Travelers' coercive tactics were not simply limited to sending an intimidating letter. Travelers also filed suit in the circuit court of Cook County, seeking a declaration of no coverage under the policies. This action was in total contradiction to Travelers' 2003 advice to Rogers that it "act in a manner that will best protect its interests with respect to the any [*sic*] settlement opportunity."

¶ 52 It is well settled that when an insured tenders defense of a claim to its insurer and the insurer believes the claim is not covered by the insurance policy, it must either (1) defend in the underlying lawsuit under reservation of rights or (2) seek a declaratory judgment that no coverage exists under the terms of the policy. *Employers Insurance of Wausau v. Ehlco*

17

*Liquidating Trust*, 186 Ill. 2d 127, 150 (1999). Where the insurer fails to take either of those two actions and is later found to have wrongfully denied coverage, the insurer is estopped from later asserting any policy defenses to coverage, even if those defenses may have been successful in the absence of the breach. *Id.* at 151-52. It is an extraordinary remedy but warranted in light of the fact that the insurer's duty to defend is "so fundamental an obligation that a breach of that duty constitutes a repudiation of the contract." *Id.* at 151.

¶ 53    While Travelers initially agreed to defend Rogers in the underlying action under a reservation of rights, Travelers attempted to take over the defense of the matter by refusing to allow Rogers to settle at a crucial time during negotiations. This crucial time was over a decade after the underlying litigation was initiated. There is no genuine issue of material fact that Rogers faced potential liability as well as damages exceeding policy limits. Travelers was well informed of Rogers's financial difficulties and that this was a "bet the company" case, meaning that if Rogers went to trial and lost, the company would be forced into bankruptcy. There was an offer to settle for $3.75 million, well within the policy limits, which Rogers believed could be further reduced. Still, Travelers refused to allow Rogers to settle and threatened Rogers that settling the case would negate coverage. Travelers then filed suit in Cook County, not St. Clair County where the Superfund sites were located, seeking a declaration of no coverage.

¶ 54    Contrary to Travelers' assertions, its actions were in no way innocuous, nor did they constitute standard industry practice. "It is inconceivable that Illinois would allow a reservation of rights to give an insurer license to prejudice its insured however it wanted. And in fact it does not. Illinois courts have found estoppel even when there has been a reservation of rights." *Willis Corroon Corp. v. Home Insurance Co.*, 203 F.3d 449, 452 (7th Cir. 2000). When the insurer chooses to defend its insured it must provide an effective defense and cannot put its interests

18

ahead of its insured. *Briseno v. Chicago Union Station Co.*, 197 Ill. App. 3d 902, 906 (1990). Here, Travelers put its interest ahead of Rogers in refusing to settle, and the circuit courts of not one but two counties found Travelers' actions underhanded.

¶ 55    Finally, just because Travelers spent over $1 million defending the underlying litigation during the previous decade does not mean estoppel cannot apply. Under the circumstances presented here, if we said that because Travelers reserved its rights and filed a declaratory judgment action before a verdict or settlement was reached in the underlying litigation that Travelers cannot be estopped from contesting coverage, then we would be allowing Travelers to manipulate the law, as well as encouraging other insurance companies to put their interests ahead of their insureds. See *Willis Corroon Corp.*, 203 F.3d at 453. After careful consideration of the arguments and the record before us, we find the trial court correctly found Travelers' conduct breached its duty to defend.

¶ 56                                    II. Pollution Exclusions

¶ 57    We are also asked to consider whether the pollution exclusions in the policies apply. Travelers contends coverage is barred by the pollution exclusions contained in some of the policies because Rogers's liabilities are the result of decades of intentional discharges of hazardous chemicals into the soil, unlined ponds, and a public sewer. Rogers responds that (1) Travelers should be estopped from raising any exclusions, (2) its use of containment ponds and Sauget's sewer system does not implicate Travelers' pollution exclusion, (3) it did not expect or intend overflows from the sewer system or retention ponds, and (4) its use of sewers and ponds was not illegal.

¶ 58    As set forth in our consideration of the first issue, Travelers is estopped from raising defenses to coverage. It, therefore, follows that there is coverage, and we need not consider

19

Travelers' arguments pertaining to the pollution exclusions contained in later policies. However, even if estoppel did not apply, we find the pollution exclusions inapplicable.

¶ 59    The pollution exclusion contained in the policies provides that coverage will not apply to in the following circumstances:

> "to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any *insured* or any person or organization for whose acts or omissions any insured is liable." (Emphasis in original.)

We agree with the circuit court of St. Clair County that the pollution exclusion does not apply here.

¶ 60    In order to determine whether a policy exclusion applies, we interpret the exclusion under normal rules of contract interpretation. *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 432-33 (2010). Any ambiguity is to be construed liberally in favor of the insured, and a court will find an ambiguity "where the policy language is susceptible to more than one reasonable interpretation" and not merely where the parties disagree as to its meaning. *Id.* at 433. The burden is on the insurer to prove an exclusion applies. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 454 (2009). If an exclusionary clause is relied upon to deny coverage, then its applicability must be clear and free from doubt. *Economy Preferred Insurance Co. v. Grandadam*, 275 Ill. App. 3d 866, 870 (1995).

¶ 61    In *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90 (1992), the insured allegedly contaminated Waukegan Harbor and Lake Michigan with PCBs contained in the wastewater from its facility, and the insured sought coverage for the resulting liability. The

20

facility discharged wastewater to an area on the insured's property known as "the North Ditch." The insured routed its wastewater to the North Ditch in an attempt to contain the material, but some of the toxic material ended up in Waukegan Harbor and Lake Michigan. The insurers argued coverage was barred on the grounds that the insured expected and intended to discharge PCBs as part of routine business operations. *Id.* at 127-29. They specifically argued it was irrelevant whether the insured "knew or should have known it was releasing PCBs so long as [the insured] knew it was releasing *some* effluent or waste material which later turned out to contain PCBs." (Emphasis in original.) *Id.* at 128. The insured countered "that it could not have expected or intended the release of PCBs into Waukegan Harbor" because "it constructed a waste treatment system through which it routed its effluent to the North Ditch in order to avoid polluting Waukegan Harbor." *Id.* In finding in favor of the insured, our supreme court specifically stated that the relevant consideration in a pollution exclusion case "is whether the insured expected and intended to discharge the particular toxic[ant] it is alleged to have discharged and for which it now seeks coverage." (Emphasis omitted.) *Id.* at 129.

¶ 62    There is a distinction between direct discharges to the environment versus placement of the material into an area the insured reasonably believes will contain the materials. In *Fruit of the Loom, Inc. v. Travelers Indemnity Co.*, 284 Ill. App. 3d 485 (1996), the insured argued that the pollution exclusion did not apply because it did not expect or intend to discharge pollutants; however, because the evidence showed that the insured routinely expected spills during its manufacturing process that would find their way directly into the environment, the pollution exclusion barred coverage. *Id.* at 498-99.

¶ 63    Here, Rogers never expected pollutants to enter the environment. Rogers took specific steps to keep the toxic and hazardous materials it hauled out of the environment by placing them

in containment ponds and by using Sauget's sewer system where they would go to the POTW facility, which was designed to specifically treat toxic materials. Travelers did not present any evidence that Rogers knew the sewer overflowed during heavy storms. Because Rogers never expected or intended for PCBs to enter the environment, the pollution exclusions are inapplicable and do not bar coverage.

¶ 64    We also disagree with Travelers' contention that coverage is barred by the exclusion relating to illegal conditions contributing to or resulting in a release. That provision provides that coverage does not apply if "any emission, discharge, seepage, release or escape" of waste or pollutants was the result of "any condition in violation of or non-compliance with any governmental rule, regulation or law applicable thereto." Travelers fails to cite any case law or authority for its contention that Rogers's use of retention ponds or the sewer system was illegal.

¶ 65    As the circuit court pointed out, the use of ponds occurred prior to 1970, which predates almost all federal and state environmental regulation. Furthermore, Sauget's sewer system and treatment facility were specifically designed to protect the environment. Under these circumstances, we fail to see how Rogers's use of the sewer violated any law. Accordingly, we find that neither Travelers' pollution exclusion nor its exclusion relating to illegal conditions bars coverage in this case.

¶ 66                                III. Settlement

¶ 67                              A. *Reasonableness*

¶ 68    We are also asked to consider whether the settlement in the underlying litigation was reasonable. According to Travelers, there are factual issues regarding not only the policy limits available but also the value of the claim against Rogers, making summary judgment in favor of

22

Rogers improper. Rogers replies that its settlement was reasonable and Travelers' opposition to the settlement is based mainly on fiction, not disputed facts. We agree with Rogers.

¶ 69     In deciding whether the settlement in the instant case is binding on the insurer, we are guided by the principles set forth by our supreme court in *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141 (2003). In that case, the plaintiff in the underlying personal injury action claimed she was exposed to lead-contaminated paint in an apartment leased to her by the defendants. *Id.* at 143. After the defendants tendered defense on the claim, the insurer denied its obligation to defend or indemnify based on a recently added endorsement to the policy excluding such claims. *Id.* at 143-44. The defendants settled the plaintiff's claim for $600,000 and assigned the plaintiff their rights under the insurer's policy. *Id.* at 144. Our supreme court rejected the insurer's arguments concerning not only the exclusion but also its argument that the insured's assignment of rights under the policy was ineffective. In that case, there was also a concern about collusion, and the court concluded that while the insurer's concern over the possibility of collusion was well taken, "the risk of collusion and fraud can be lessened ***, if not avoided altogether, by placing a requirement upon the plaintiff to prove that the settlement it reached with the insured was reasonable before that settlement can have any binding effect upon the insurer." *Id.* at 163.

¶ 70     The test for reasonableness involves a two-part inquiry. First, "whether, considering the totality of the circumstances, the insured's decision 'conformed to the standard of a prudent uninsured.' " (Emphasis omitted.) *Id.* (quoting *Rhodes v. Chicago Insurance Co.*, 719 F.2d 116, 120 (5th Cir. 1983)). Second, "with respect to the amount of damages agreed to, the test 'is what a reasonably prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim.' " *Id.* (quoting *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982)). With

23

respect to the amount of damages, we should take a "commonsense consideration of the totality of 'facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial.' " *Id.* (quoting *Miller*, 316 N.W.2d at 735). The burden is on the underlying plaintiff to prove the settlement was reasonable. *Id.* at 164.

¶ 71   Here, the trial court concluded the $7.5 million settlement was reasonable in light of the fact that the Area 1 cleanup already cost over $30 million and future remediation costs of the area were estimated to be over $21 million. In addition, underground water remediation was already in excess of $40 million with additional costs expected. Travelers agreed to defend Rogers under 22 policies, with combined limits of over $7 million. This amount does not even take into consideration the value of the lost/missing policies. Litigation surrounding the lost/missing policies remains pending in the circuit court of Cook County.

¶ 72   Still, Travelers argues the $7.5 million settlement is unreasonable given the fact that Rogers knew claimants would accept between $3 and $4 million to settle the underlying litigation. We find Travelers argument not only disingenuous but also hypocritical. During negotiations, Rogers told Travelers the case could be settled for between $2 and $3 million, but in order for this to happen, it would require a cash settlement. Travelers strenuously objected to any settlement as evidenced by the December 30, 2010, letter. If Travelers had been reasonable, then this matter would have been settled almost seven years ago and this litigation could have been avoided. We agree with the trial court that "Travelers' conduct and inconsistent positions placed Rogers in an untenable situation; Travelers cannot complain later if its insured acted reasonably to protect its interests."

¶ 73   The settlement was approved by the district court on April 27, 2011. The judge who approved the settlement was in a far better position than any other judge to determine its

24

reasonableness because he presided over the underlying litigation for more than a decade. Travelers did not object to the settlement before it was approved by the district court.

¶ 74                                B. *Collusion*

¶ 75    Travelers next asserts that the settlement was a product of collusion between Rogers and the underlying claimants. Despite Travelers assertions to the contrary, the extensive record before us shows the issue of collusion has been fully heard, considered, and ruled on by not only the circuit court of St. Clair County but also the circuit court of Cook County. Still, because this case comes before us pursuant to summary judgment, our review is *de novo. Id.* at 149.

¶ 76    We first point out that the settlement was approved by the district court and that Travelers did not object to the settlement in federal court. Second, the circuit court of St. Clair County specifically stated that during a March 21, 2013, hearing on the motion for partial summary judgment, the term "collusion" was mentioned 30 times while "collusive" was mentioned 4 times. The St. Clair County court found the issue was argued and a ruling was, therefore, appropriate.

¶ 77    Third, in its May 21, 2014, order finding that the circuit court of St. Clair County already resolved the issues involved in the parties' cross-motions for summary judgment pending in Cook County, the judge in the Cook County matter specifically stated with regard to collusion as follows:

> "Like the consent issue, the collusion/bad faith issue was squarely addressed in and resolved by the St. Clair Order. [The St. Clair County judge] found 'no evidence of fraud, collusion, or other wrongdoing by Rogers or the Underlying Claimants.' ***
>
>                                * * *

25

Further, as a factual matter, Rogers did not conceal settlement discussions from Travelers. It is true that a cooperation clause requires an insured to disclose to its insurer any communications with their defense counsel regarding a claim which the insurer has the ultimate duty to satisfy [citation]. However, here, Rogers did disclose its communications to Travelers. Rogers' failure to immediately inform Travelers of the Underlying Claimants' October 8, 2010 settlement demand letter does not appear to be relevant, as Rogers and the Underlying Claimants continued to negotiate, and Rogers was eventually sent a new settlement demand on November 2, which Rogers forwarded to Travelers on November 3. The short response date does not appear to be due to any misconduct by Rogers. Nor does the short response time seem significant, given Travelers' consistent rejection of settlement proposals. To this day, Travelers has not suggested that it would have significantly relaxed its opposition to settlement if it had had more time to think about it."

The Cook County court went on to find that even though Rogers may not have disclosed every detail of settlement negotiations to Travelers, Travelers was unable to show prejudice. We agree with this analysis.

¶ 78 A settlement may be deemed unreasonable if there is evidence of bad faith, fraud, or collusion. *Central Mutual Insurance Co. v. Tracy's Treasures, Inc.*, 2014 IL App (1st) 123339, ¶ 79. "[A]ny negotiated settlement involves cooperation to a degree," and a settlement only "becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party." (Internal quotation marks omitted.) *Id.* ¶ 80. Indicators of bad faith and collusion include unreasonableness, misrepresentation, concealment, lack of serious negotiations on damages, attempts to affect the insurance company, attempts to harm the interest of the insurer, the overall

26

settlement of the case in light of its value, the facts known to the settling insured at the time of settlement, the presence of a covenant not to execute as part of the settlement, and the failure of the settling insured to consider viable defenses. *Id.* ¶¶ 80-81.

¶ 79 As previously determined, the settlement was reasonable. Despite Travelers' argument, we see no evidence in the record that Travelers was "baited" into rejecting the cash deal so that Rogers would then be able to enter into the $7.5 million insurance settlement. Both Ms. Larson and Mr. Schultz testified Rogers preferred the cash settlement to the $7.5 settlement.

¶ 80 Travelers also asserts it was actively misled by deceptive billing statements into believing Rogers was preparing its defense for trial, when it was not. We find it ironic that in arguing the first issue in this appeal, Travelers presented the opposite argument, that Rogers was not preparing for trial but was focused solely on settling the matter. Travelers cannot have it both ways. The record here shows that while Mr. Schultz and his associates were preparing for trial, they were also negotiating a settlement. There is nothing sinister in both preparing for trial and attempting to settle a case. This frequently occurs during litigation.

¶ 81 Our review of Schultz's law firm billing records from October 2010 through December 2010 shows extensive billing during that time for "telephone conferences with opposing counsel." On November 29, 2010, Schultz's firm billed specifically for review of "settlement negotiation documents," and on December 17, 2010, the firm billed for preparation and review of "draft settlement agreement." On December 28, 2010, Rogers's in-house counsel, Michelle Larson, wanted Travelers to settle the case for $2 million, but Travelers rejected her proposal.

¶ 82 Even though Rogers did not forward the October 8, 2010, demand letter that set forth two different settlements, one for cash and one for insurance proceeds, the record is clear that was not the end of negotiations. The parties continued to negotiate and did not sign a settlement

27

agreement until February 4, 2011. On December 30, 2010, Travelers sent a letter in which it acknowledged negotiations but ordered Rogers to reject any offer or risk negating coverage.

¶ 83　Travelers makes much of the fact that the settlement provides for money to potentially come back to Rogers; however, this is the same type of settlement that occurred in 2003 when Mr. Sauget settled during the first trial. Mr. Sauget's liability was fixed at $9.2 million, of which he only paid $60,000 but agreed to pursue insurance for the remainder. And, as Rogers points out, none of the cases cited by Travelers states that money back is *per se* collusive.

¶ 84　Travelers relies on *Sidman v. Travelers Casualty & Surety*, 841 F.3d 1197 (11th Cir. 2016). Travelers' reliance on that case is misplaced for at least two reasons: (1) it was decided under Florida law and (2) the settlement agreement in *Sidman* was negotiated in bad faith because it was proven that the insured was willing to agree to any fee so long as judgment would only be enforced against Travelers and there was a undisclosed side agreement. *Id.* at 1205-06. In the instant case, the agreement was not negotiated in bad faith. In fact, Rogers's attorneys testified they preferred the lesser settlement to the one agreed upon, and there were no undisclosed side agreements. The terms of the settlement were in the open.

¶ 85　Travelers relies heavily on *Tracy's Treasures*, 2014 IL App (1st) 123339, in support of its argument that the $7.5 million settlement in the instant case was collusive. However, that case is distinguishable from the instant case. The insurer in that case did not breach its duty to defend, thereby retaining its ability to contest the reasonableness of the settlement. *Id.* ¶ 54.

¶ 86　Here, as previously discussed, Travelers breached its duty to defend. We also point out that *Tracy's Treasures* reaffirmed that in Illinois when an insurer cedes control of the defense to the insured, such as Travelers did here, the insured may enter into a reasonable settlement without the insurer's consent. *Id.* ¶ 44. In this case, Travelers has failed to convince us that there

28

was the type of misrepresentations and/or concealment necessary for a finding of a collusive settlement.

¶ 87                                    IV. Duty to Settle

¶ 88    Another issue raised in this appeal is whether Travelers breached its duty to settle. Travelers insists summary judgment on the issue of breach of duty to settle was improper. We disagree.

¶ 89    When an insurer is pursued for refusing to settle a claim, "bad faith" lies in its failure to give at least equal consideration to the insured's interests when the insurer arrives at a decision as to whether to settle the claim. *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1172 (2002). Courts consider a number of factors to decide whether an insurer's actions constitute bad faith, including (1) potential for an adverse verdict, (2) potential for damages in excess of policy limits, (3) refusal to negotiate, (4) communication with the insured, (5) adequate investigation and defense, and (6) advice of the insurance company's own adjusters and defense counsel. *Id.* at 1172-75. In finding bad faith, courts consistently rely on evidence of the potential for damages in excess of the policy limits.

¶ 90    As our supreme court has stated, "The duty of an insurance provider to settle arises when a claim has been made against the insured and there is a reasonable probability of recovery in excess of policy limits and a reasonable probability of a finding of liability against the insured." *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 417 (2001). The duty does not arise until a third party demands a settlement within policy limits. *Id.* Whether a duty to settle in good faith exists under a particular set of facts is a question of law. *John Crane, Inc. v. Admiral Insurance Co.*, 2013 IL App (1st) 093240-B, ¶ 34 (citing *Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110, 116 (1995)).

29

¶ 91 Travelers' December 30, 2010, threatening letter is damaging and shows bad faith. Travelers' subsequent filing of a lawsuit in a separate county seeking a declaration of no coverage is also offensive. While an insurer can reject a bad deal, it must settle within policy limits if that would be "the honest and prudent course." *La Rotunda v. Royal Globe Insurance Co.*, 87 Ill. App. 3d 446, 454 (1980). Considering the factors pertinent to an assessment of bad faith, *e.g.*, refusal to negotiate, advice of defense counsel, communication with the insured regarding settlement offers, a substantial prospect of an adverse verdict, the potential for damages to exceed the policy limits (*O'Neill*, 329 Ill. App. 3d at 1172-75), no genuine issues of material fact preclude summary judgment in favor of Rogers. Travelers' actions amount to evidence of "bad faith" in refusing to settle within policy limits.

¶ 92                    V. Claim Under Section 155 of the Insurance Code

¶ 93 The final issues raised by Travelers pertains to the trial court's award of attorney fees pursuant to section 155 of the Insurance Code (215 ILCS 5/155 (West 2012)). Travelers asserts that that even if we find that it breached its duty to defend, section 155 penalties are inappropriate because there was a *bona fide* dispute concerning the scope and application of coverage and because the settlement agreement already accounts for attorney fees. We disagree.

¶ 94 Section 155 allows attorney fees in favor of a successful plaintiff who shows that the conduct of an insurance company with respect to a claim is "vexatious or unreasonable." Section 155 states in pertinent part:

> "(1) In any action by or against a company wherein there is in issue the liability of
>
> a company on a policy or policies of insurance or the amount of the loss payable
>
> thereunder, or for an unreasonable delay in settling a claim, and it appears to the court

30

that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees ***." *Id.* § 155(1).

The purpose of section 155 is to provide a remedy to insureds who encounter unnecessary difficulties resulting from an insurance company's vexatious and unreasonable refusal to honor its contract with the insured. *Korte Construction Co. v. American States Insurance*, 322 Ill. App. 3d 451, 459 (2001).

¶ 95 Section 155 was intended to make lawsuits by policyholders economically feasible and to punish insurers. *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 521 (1996). In determining whether section 155 applies, a court must consider the totality of the circumstances, including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his or her property. *Illinois Founders Insurance Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 31. Some cases have applied a *de novo* standard of review to summary judgment rulings involving section 155 sanctions. See, *e.g.*, *Korte Construction*, 322 Ill. App. 3d at 460; *Employers Insurance of Wausau*, 186 Ill. 2d at 160. However, other cases have explained that even though review of summary judgment is *de novo*, whether an insurer's actions are unreasonable and vexatious is a question of fact, and therefore, the trial court's determination on that question, even in the context of summary judgment, should be upheld absent an abuse of discretion. See, *e.g.*, *John T. Doyle Trust v. Country Mutual Insurance Co.*, 2014 IL App (2d) 121238, ¶ 30; *American States Insurance Co. v. CFM Construction Co.*, 398 Ill. App. 3d 994, 1003 (2010). Here, under either standard of review, the trial court's determination that the insurer's actions were unreasonable and vexatious should be affirmed.

¶ 96 The trial court found that Travelers acted vexatiously and unreasonably within the meaning of section 155 of the Insurance Code in refusing to settle within policy limits. In *Shell*

31

*Oil Co. v. AC&S, Inc.*, 271 Ill. App. 3d 898 (1995), we held that the insurer's refusal to defend its insured was vexatious and unreasonable because the insurer refused the insured's demand for a defense and failed to bring a declaratory judgment action to determine its rights and obligations, choosing instead to wait until the insured was forced to institute a declaratory judgment action. *Id.* at 909. Similarly, in this case, Travelers sent a letter in which it threatened to deny coverage if the case was settled or negotiations continued and then filed a lawsuit in a separate county seeking a declaration of no coverage. We agree with the trial court that the conduct of Travelers is vexatious and unreasonable within the meaning of section 155 of the Insurance Code.

¶ 97 Additionally, we are unconvinced by Travelers' assertion that in this case a *bona fide* dispute concerning the scope and application of coverage exists, precluding an award of fees and costs under section 155. Travelers insists there was a legitimate dispute regarding who would pay and how much for any settlement, as well as policy-based grounds, such as the pollution exclusions, so that the award under section 155 should be reversed. We are aware that " '[w]here a *bona fide* dispute concerning coverage exists, costs and sanctions [pursuant to section 155] are inappropriate.' " *Illinois Founders Insurance*, 2015 IL App (1st) 122481, ¶ 32 (quoting *State Farm Mutual Automobile Insurance Co. v. Smith*, 197 Ill. 2d 369, 380 (2001)). However, we agree with plaintiffs that an insurer may not overcome section 155 damages by cloaking its bad faith under the guise of a *bona fide* dispute. The trial court correctly reasoned, "No Illinois case supports the contention that raising a *bona fide* dispute over coverage entitles an insurance company to mislead and threaten its insured in an attempt to sabotage settlement negotiations." Even though Travelers defended Rogers under reservation of rights for a lengthy period of time,

Travelers' mishandling and mismanagement of settlement negotiations was so egregious that an award under section 155 is warranted.

¶ 98 Finally, we are unconvinced by Travelers' assertion that plaintiffs cannot be awarded attorney fees under section 155 because attorney fees are included in the $7.5 million settlement. While Judge Babka, the first St. Clair County judge to preside over this case, noted that "the 'Settlement Agreement' between Rogers and the Underlying Claimants already provides for substantial attorney fees for Rogers—up to $3 million—so additional attorneys' fees may not even be warranted," Judge Babka did not address the issue in full. After briefing and oral argument on the issue, Judge Babka's successor, Judge Rudolf, awarded an additional $2,665,384.90 in attorney fees.

¶ 99 Judge Rudolf rejected Travelers' argument that the true value of Rogers's underlying liability was only $4 million, and attorney fees were added to reach the $7.5 million settlement, pointing out that the $7.5 million settlement was appropriate in light of potential liability of $30 million or more. Employing "logic and common sense," Judge Rudolf determined that the parties did not structure the settlement agreement to incorporate potential section 155 damages because to do so would essentially cap any award against Travelers and "would insulate Travelers from the consequences of vexatious and unreasonable conduct, and arguably would provide 'unrestricted license' so to speak, to continue such conduct moving forward without repercussions." After careful consideration, we agree with Judge Rudolf that there is no evidence to support Travelers' assertion that money was added to the settlement for attorney fees. Accordingly, we affirm the award of $2,665,384.90 in attorney fees and costs under section 155 of the Insurance Code.

33

¶ 100                                    CONCLUSION

¶ 101   For the foregoing reasons, we affirm summary judgment in favor of Rogers on all issues, including the award of attorney fees and an additional $60,000 penalty pursuant to section 155.

¶ 102   Affirmed.

¶ 103   JUSTICE CATES, dissenting:

¶ 104   I cannot join my colleagues in this matter for two reasons. First, there was no consideration of the fact that the attorney in this case, Rob Schultz, had a dual role in representing Travelers and Rogers. The Illinois Rules of Professional Conduct address the difficult situations encountered by lawyers who serve two masters. Here, Schultz was paid by Travelers, and had been selected by Rogers. Therefore, in my view, it was incumbent upon Schultz to keep Travelers fully informed of the two settlement offers that were proposed. On October 8, 2010, the claimants sent a letter that contained alternative settlement proposals. The first offered to settle the case for $4 million if Travelers was a participant. Alternatively, the claimants agreed to resolve the litigation for $7.5 million, with Rogers paying $50,000 out of pocket, and with Rogers giving the claimants the right to proceed against Travelers for the remaining funds. The majority notes that "Rogers did not forward the letter to Travelers." *Supra* ¶ 46. But Rogers was not the attorney of record in this matter. Schultz was the individual obligated to send the letter to Travelers, and it is unclear why Schultz chose not to send this information to Travelers. Further, just four days after receiving the alternative settlement demands from the claimants, Travelers requested by letter "copies of all pertinent correspondence" that had been received regarding settlement. Yet Travelers did not receive a

34

copy of the October 8, 2010, letter. This failure to advise Travelers of the alternative scenarios for settlement, in my view, set in motion the ultimate findings of bad faith against Travelers.

¶ 105  I believe this view is further supported by the fact that Travelers responded to the December 28, 2010, e-mail from Michelle Larson, by stating it "remains ready and willing to discuss settlement as this matter progresses and, of course, Travelers will consider any and all reasonable settlement demands." This statement was ignored by the lower courts in concluding that Travelers acted in bad faith and was not dealt with by the majority opinion. Nevertheless, in my view, had Schultz kept both of his clients fully informed, as he was obligated to do, the result in this case may have been very different. Therefore, I must dissent.

2018 IL App (5th) 160098

NO. 5-16-0098

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| ROGERS CARTAGE COMPANY, PHARMACIA CORPORATION, and SOLUTIA, INC., | ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 11-MR-27 |
| THE TRAVELERS INDEMNITY COMPANY and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | ) ) ) ) ) | Honorable Brian A. Babka and Honorable Heinz M. Rudolf, |
| Defendants-Appellants. | ) | Judges, presiding. |

_____

**Opinion Filed:**      April 5, 2018

_____

**Justices:**      Honorable Richard P. Goldenhersh, J.

Honorable Melissa A. Chapman, J., concurred
Honorable Judy L. Cates, dissented

_____

**Attorneys for Appellants**      Donna J. Vobornik, John Grossbart, Steven L. Merouse, Geoffrey J. Repo, Dentons US LLP, 233 South Wacker Drive, Suite 5900, Chicago, IL 60606

_____

**Attorneys for Appellees**      Bernard J. Ysursa, Cook, Ysursa, Bartholomew, Brauer & Shevlin, Ltd., 12 West Lincoln Street, Belleville, IL 62220; Joseph G. Nassif, Nassif Law Firm, 10701 Kingsbridge Estates Drive, Creve Coeur, MO 63141; Charles R. Hobbs II, Lathrop & Gage LLP, Pierre Laclede Center, 7701 Forsyth Blvd., Suite 500, Clayton, MO 63105

_____